BOSTON PRESERVATION ALLIANCE, INC., & others[1] *vs.*
SECRETARY OF ENVIRONMENTAL AFFAIRS & others.[2,3]

Suffolk. November 8, 1985. — January 9, 1986.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Environmental Affairs. Administrative Law,* Agency's interpretation of statute.
*Boston Redevelopment Authority. Words,* "Agency."

Where the basis under G. L. c. 30, § 62A, for requiring a real estate
developer to furnish an environmental impact report with respect to a
project was the fact that the developer had to obtain a permit from the
Department of Public Works to remove and relocate a highway access
ramp, the Secretary of Environmental Affairs properly limited the scope
of the report to the traffic-related impact of the project. [493-495]
The Secretary of Environmental Affairs properly concluded that the involve-
ment of the Boston Redevelopment Authority in a series of transactions
transferring title to certain real property from the city of Boston to a
real estate developer was not such as to require the developer to furnish
a full-scale environmental impact report with respect to the proposed
development of the property. [495-497]
In approving certain aspects of a real estate development project the Boston
Redevelopment Authority was acting as the planning board for the city of
Boston, rather than as an agency as that term is defined in G. L. c. 30,
§ 62, and, consequently, the project's developer was not required to
furnish environmental impact reports respecting the matters approved.
[497-498]

CIVIL ACTION commenced in the Superior Court Department
on September 19, 1984.

The case was heard by *J. Harold Flannery,* J.

[1] Fifteen individuals domiciled within the Commonwealth, as provided
in G. L. c. 214, § 7A (1984 ed.).

[2] Chiofaro Company and Fort Hill Square Associates.

[3] We acknowledge the briefs of the Conservation Law Foundation of New
England, Inc., and Citizens for a Better New England Life, Inc., as amici
curiae.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas B. Bracken* (*Herbert Gleason* with him) for the plaintiffs.

*Anne Rogers,* Assistant Attorney General, for the Secretary of Environmental Affairs.

*Richard W. Renehan* (*Richard Rudman* with him) for Fort Hill Square Associates & another.

*Thomas H. Martin* & *John Willshire,* for Citizens for a Better New England Life, Inc., amicus curiae, submitted a brief.

*Armond M. Cohen,* for Conservation Law Foundation of New England, Inc., amicus curiae, submitted a brief.

NOLAN, J. The plaintiffs challenge a decision of the Secretary of Environmental Affairs (Secretary) that restricted the scope of the Environmental Impact Report (EIR) that the defendant developer was required to prepare in connection with the development of a project in Boston's financial district, to be known as "International Place at Fort Hill Square." Following a one-day bench trial in the Superior Court, the trial judge affirmed the decision of the Secretary in a commendably comprehensive memorandum and order. Judgment entered for the defendants on January 11, 1985. The plaintiffs seasonably appealed to the Appeals Court, and we transferred the appeal to this court on our own motion. We affirm the judgment.

The relevant facts, which are taken in the main from the stipulation of the parties, are summarized as follows. In 1982, by enactment of c. 190, § 24, the Legislature amended c. 486 of the Acts of 1909, as appearing in St. 1966, c. 642, § 12, by inserting, after § 31B, §§ 31C and 31D.[4] Section 31D permitted the Boston Public Facilities Commission (PFC) to dispose of any or all city-owned off-street parking structures, including the real estate related thereto, as surplus property.[5] On November 16, 1982, the PFC voted and, pursuant

---

[4] Chapter 486 of the Acts of 1909 has been amended further by St. 1983, c. 643, § 11(*b*).

[5] Section 31D provides that: "Notwithstanding the provisions of chapter four hundred and seventy-four of the acts of nineteen hundred and forty-six

to St. 1966, c. 642, § 3 (*f*) (ii), delegated to the Boston Redevelopment Authority (BRA) the full authority to study and establish goals and criteria for the disposition and potential future development of five municipal parking properties in Boston.[6] Included among these properties was the Fort Hill Square garage.

On January 10, 1983, the defendant Fort Hill Square Associates (FHSA) and its development agent, the Chiofaro Company, made a formal proposal to the BRA for the development of the Fort Hill Square property. On October 20, 1983, the BRA voted to recommend to the PFC the tentative designation of FHSA as "redeveloper of the Fort Hill Square Garage facility." The PFC approved the tentative designation of FHSA on October 21, 1983, and voted, subject to the approval of the mayor, to "sell the land with building thereon located at Fort Hill Square Garage in the Downtown district of the City of Boston, to Fort Hill Square Associates." As required by St. 1982, c. 190, § 24, the Boston city council voted on November 23, 1983, to transfer "care, custody, management and control" of the Fort Hill Square property to the PFC. See note 5, *supra.*

---

or any other general or special law to the contrary, the public facilities commission of the city of Boston may dispose of any or all of the off-street parking structures, including the real estate related thereto, owned by the city of Boston, as surplus property in accordance with sections thirty-one B and thirty-one C of chapter four hundred and eighty-six of the acts of nineteen hundred and nine, only when transferred to the commission by a majority vote of the city council."

[6] The PFC vote established that: "Pursuant to the authority contained in St. 1966, c. 642, § 3 (f) (ii), the Public Facilities Commission does hereby delegate to the Boston Redevelopment Authority full authority to study and establish goals and criteria for the disposition and potential further development of the following five municipal parking garage properties in the City of Boston; to advertise or otherwise seek developer proposals, to contract for consultant and other services necessary and appropriate for these purposes, to prepare agreements, deeds, and other instruments necessary and appropriate to disposition and development of such properties, and to otherwise administer and carry out all activities on behalf of the Public Facilities Commission for these purposes, for review by the City: Government Center Garage, St. James Avenue Garage, 30 Kilby Street Garage, Kingston-Bedford Streets Garage and Fort Hill Square Garage" (punctuation added).

On December 12, 1983, the PFC voted, inter alia, to sell the Fort Hill Square garage to the Boston Redevelopment Authority. The PFC further voted to authorize and empower the BRA to "take. all actions deemed necessary and appropriate for the disposition of the Fort Hill Square Garage in accordance with the . . . Sale and Construction Agreement to be entered into by the City of Boston, the Boston Redevelopment Authority and the proposed Grantee [FHSA]." This transaction was approved by the mayor as required.

In addition to the above described involvement, the BRA conditionally approved FHSA's schematic design and design development plans submitted during the design review phase of the project in April and May of 1984. Thereafter, the BRA gave final approval to the design plans for phase one of the project. At trial, during cross-examination of a witness called by the defendants, it was admitted that the BRA had granted at least six approvals to the defendants that were "absolutely essential" for the International Place project to proceed toward construction.

The plaintiffs argue that the Secretary was required, under the Massachusetts Environmental Policy Act (MEPA), G. L. c. 30, §§ 61-62H, to order a "full scope" environmental impact report (EIR) for the project. According to the plaintiffs, the EIR should have covered, in addition to the areas required by the Secretary, a study of the potential "wind, shadow, visual, historical and archaeological" impacts of the project. The plaintiffs cite three grounds for their position. First, they contend that, because State approval for the removal of the High Street ramp is or may be required, the Secretary should have included in the scope of the EIR, "all" the environmental impacts "directly or indirectly caused by State approval of the ramp removal." The plaintiffs next state that the BRA was sufficiently involved in the transfer to FHSA of the city owned land to require a full scope EIR. Finally, the plaintiffs argue that the BRA was acting as an "agency" when it granted various approvals to FHSA, and therefore, under MEPA and the regulations promulgated by the Secretary, a full scope EIR is required for all of the impacts related to these BRA approvals. We now address the plaintiffs' arguments.

1. *Permit-related EIR.* Pursuant to G. L. c. 30, § 62A, FHSA submitted to the Secretary on May 15, 1984, an environmental notification form. This is the first step in determining whether an EIR is required. If the EIR is required, the scope of the issues to be analyzed in the report is then determined by the Secretary.[7]

On June 21, 1984, the Secretary, pursuant to G. L. c. 30, § 62A, issued a certificate defining the scope of the EIR required for the International Place project. On June 22, 1984, he released a memorandum fully explaining the basis for his decision, and stating that he was exercising jurisdiction over "all significant environmental impacts of International Place." The Secretary initially identified two grounds for exercising MEPA jurisdiction. First, he found that jurisdiction existed over the sewerage impacts of the project, by virtue of the two State permits "required to sewer the building."[8] Accordingly,

---

[7] General Laws c. 30, § 62A (1984 ed.), provides in pertinent part: "A person applying or intending to apply to an agency for a permit or for financial assistance for a project . . . shall no later than ten days after filing the first application for such permit or assistance notify the secretary of environmental affairs of the nature of the project and of such application, if any, on such forms as said secretary shall prescribe and shall transmit copies of said notification forms to such agency from which a permit or financial assistance is or may be sought. Any agency proposing a project may file said notification forms prior to the development of the project and shall file said forms no later than the secretary of environmental affairs shall by regulation prescribe. Within thirty days after issuance of notice of the receipt of such notification, the secretary shall consult with the person or agency proposing the project and the agency, if any, from which a permit or financial assistance is or may be sought and shall issue a certificate stating whether an environmental impact report is required. If a report is required, the secretary with the cooperation of said person and agency shall, within the above mentioned thirty day period, limit the scope of the report to those issues which by the nature and location of the project are likely to cause damage to the environment. The secretary shall determine the form, content, level of detail and alternatives required for the report. In the case of a permit application to an agency from a private person for a project for which financial assistance is not sought the scope of said report and alternatives considered therein shall be limited to that part of the project which is within the subject matter jurisdiction of the permit. Any finding required by section sixty-one shall be limited to those matters which are within the scope of the environmental impact report, if any, required by this section."

[8] Permits were required from the Department of Environmental Quality Engineering-Division of Water Pollution Control and the Metropolitan District Commission.

he ordered the FHSA to prepare an EIR analyzing the sewage generation and water usage impacts of the project.

The Secretary next determined that he could exercise jurisdiction over the traffic related impacts of the project because of the proposed relocation of the High Street ramp. Since a permit from the Massachusetts Department of Public Works would be required to accomplish this relocation, the Secretary concluded that MEPA jurisdiction could be exercised. See G. L. c. 30, § 62A. The Secretary accordingly required FHSA to analyze all of the direct and indirect transportation impacts of the project, including the impacts on traffic flow, pedestrian circulation, parking, and mass transit.

The plaintiffs contend that the Secretary erred by deciding to include only the traffic related impacts of the project in the scope of this EIR. The plaintiffs argue that the EIR should have included "all" of the environmental impacts directly or indirectly related to the ramp removal. We find no merit in this argument. General Laws c. 30, § 62A, specifically grants to the Secretary the authority to determine the form, content, and level of detail required in an EIR. See note 7, *supra*. The only basis under § 62A for exercising MEPA jurisdiction over the traffic impacts of the International Place project derived from the fact that a State permit from the Department of Public Works would be required to remove and relocate the High Street ramp. This requirement entitled the Secretary to exercise jurisdiction over the "traffic related" impacts of the project. In his memorandum, the Secretary correctly recognized that, in reviewing a project that is subject to MEPA only because it requires State agency permits, the scope of the EIR is circumscribed by the limitation of subject matter jurisdiction set forth in G. L. c. 30, § 62A. In conformity with this limitation, the Secretary restricted the scope of the EIR to the traffic impacts. Moreover, the regulations promulgated by the Secretary pursuant to G. L. c. 30, § 62H, reinforce the statute and provide that, for projects such as International Place, where no public financial assistance is being sought, "the scope of the EIR shall be limited to no more than all direct and indirect impacts from activity necessary to carry out that part of the

project which is within the subject matter jurisdiction of [the] permit." 301 Code Mass. Regs. 10.05 (5) (1979). An agency's interpretation of its own rule is entitled to considerable weight. See *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976). We concur in the trial judge's ruling that the Secretary reasonably exercised his discretion in defining the scope of the EIR required for the traffic related impacts of the International Place project.

2. *The BRA's role in the land transfer.* In addition to the "permit-specific" grounds for MEPA jurisdiction described above, the Secretary also concluded after reviewing the sale and construction agreement that he could exercise "even broader jurisdiction . . . over the project." This ruling was based on the Secretary's determination that "[i]n projects where an 'agency' as defined by MEPA makes a land transfer, the subject-matter jurisdiction limitation does not apply."[9] Thus, the Secretary stated that, since the BRA was conveying the Fort Hill Square property to FHSA, his MEPA jurisdiction was not "limited as to subject-matter." The Secretary therefore required the defendants to include within the scope of the EIR, in addition to the traffic and sewerage impacts, a study of the air quality, wind, shadow, visual, historical, archaelogical and construction impacts of the project. In opposing this decision, FHSA argued that the Secretary was misinterpreting the BRA's role under the sale and construction agreement. In his original memorandum, the Secretary had stated that he would revise the scope of the EIR if he were provided with documentation that would demonstrate that "the BRA has not been and will not be in the chain of title for [the Fort Hill Square] property. . . ." This documentation was promptly provided to the Secre-

---

[9] As stated by the Secretary, "examples of this principle are Copley Place (transfer by Mass. Turnpike Authority) and Marketplace Center (transfer by BRA). Both EIRs had Scopes which were not constrained by subject-matter jurisdiction." The secretary's memorandum does not cite the specific authority for this principle. However, 301 Code Mass. Regs. § 10.32 (2)(g) 1 d (1979), includes within the scope of MEPA "transfers of real property by any agency . . . where the transferee intends construction costing in excess of $1 million [dollars]." The International Place project fits within this category.

tary,[10] and on July 23, 1984, he issued a revised decision deleting from the scope of the EIR the wind, shadow, visual, historical, archaelogical and construction impacts of the project. The trial judge found that "the BRA at the time of the Secretary's revised scoping decision was not and had not been an owner of the property." The judge accordingly held that the "Secretary did not err as to that basis for revising his initial scoping decision." We agree with the trial judge on this point.

The Secretary originally thought that he could exercise broad jurisdiction over the International Place project because of the BRA's involvement in the transfer of title. It was later demonstrated to the Secretary's satisfaction that the BRA was not in the chain of title. The Secretary stated that he had reviewed all other arguable bases for the MEPA jurisdiction, but found none that would require inclusion of the deleted impacts in the scope of the EIR. The Legislature has granted the Secretary authority to "promulgate reasonable rules and regulations" to carry out the purposes of the environmental policy act. G. L. c. 30, § 62H (1984 ed.). We have recognized that, "[w]hen the Legislature delegates to an administrative agency a broad grant of authority to implement a program . . . the administrative agency generally has a wide range of discretion in establishing the parameters of its authority . . . ." *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 525 (1979). The trial judge appropriately deferred to the judgment of the Secretary. See generally *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 75 (1979) (agency has considerable leeway in interpreting statute it is charged with enforcing); *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976) (agency interpretation of its own rule entitled to great

---

[10] Two letters were sent to the Secretary stating that the BRA would not be in the chain of title to the Fort Hill Square property. One of these letters was sent by the then director of the BRA, and the second letter was sent by the mayor's development advisor. On October 31, 1984, a confirmatory amendment to the sale and construction agreement was executed. The agreement clarified the involvement of the BRA in the land transfer, and made it clear that the "conveyance of the Property shall be made by the City directly to the Developer with payment . . . to be made by the Developer directly to the City . . . ."

weight). Nevertheless, the plaintiffs claim that yet another basis for MEPA jurisdiction does exist. We now address this claim.

3. *BRA as an agency subject to MEPA.* As argued before the trial judge, the plaintiffs contend on appeal that the BRA is an "agency" as that term is defined in G. L. c. 30, § 62 (1984 ed.). They further state that, under § 62, a permit includes agency approval for a project, and therefore, under MEPA, an EIR is required for all of the impacts resulting from the various BRA approvals granted to FHSA.

It is not seriously disputed that the BRA is in fact an agency, as that term is defined in G. L. c. 30, § 62. However, the defendants, including the Secretary, argue that the BRA was not acting as an "agency" when it granted approvals to FHSA. The defendants state that we must look at the unique composition of the BRA to determine whether it is acting as an agency subject to MEPA in this case. The BRA was originally created as the redevelopment authority for the city of Boston. St. 1957, c. 150, § 1, repealed and superseded by St. 1969, c. 751, §§ 1, 2. In this capacity, it is the function of the BRA to carry out urban renewal programs in accordance with c. 121B of the General Laws, inserted by St. 1969, c. 751, § 1. The BRA also acts, however, as the planning board for the city of Boston, see St. 1960, c. 652, § 12, and, as in this case, under powers delegated to it by the PFC. See St. 1966, c. 642, § 3 (*f*) (ii). The defendants state that, when the BRA is acting in a municipal capacity, it is not acting as an agency subject to MEPA. See *Bailey* v. *Board of Appeals of Holden,* 370 Mass. 95, 98 (1976) (local housing authority not subject to requirements of G. L. c. 30, § 62).

The Secretary also acknowledges that the BRA acts in more than one capacity, and that the statute, G. L. c. 30, § 62, does not address the question of how the BRA should be viewed under these circumstances. The Secretary claims that he was required to determine whether, in a case such as this, the BRA should be treated as a municipal body not subject to MEPA, see *Bailey, supra,* or as an agency subject to MEPA jurisdiction. The Secretary adopted the former position. As stated by

the trial judge, "according to the Secretary, when the Boston Redevelopment Authority is exercising zoning powers as a planning board, it is not an 'authority' within the meaning of c. 30, § 62." The Secretary urges the court to defer to his administrative discretion in making the decision not to exercise MEPA jurisdiction over the BRA when it is acting pursuant to its municipal powers. See *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 525 (1979). The discretion granted to an administrative agency is "particularly broad when [the] agency is concerned with fashioning remedies and setting enforcement policy." *Greater Boston Television Corp.* v. *FCC,* 444 F.2d 841, 857 (D.C. Cir. 1970), cert. denied, 403 U.S. 923 (1971). This principle, however, is "one of deference, not abdication," and this court will not hesitate to overrule agency interpretations of statutes or rules when those interpretations are arbitrary or unreasonable. See *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976). We rule that the Secretary's interpretation and administration of the statute in this case was reasonable and, therefore, should not be disturbed.

The plaintiffs argue, however, that the Secretary's decision conflicts with the intent and language of G. L. c. 30, § 61 (1984 ed.), which states: "Unless a clear contrary intent is manifested, all statutes shall be interpreted and administered so as to minimize and prevent damage to the environment." The plaintiffs have not demonstrated that the Secretary failed to comply with the directive of the statute. The BRA itself undertook an environmental review of International Place that included a study of all the impacts that the plaintiffs seek to add. As the trial judge correctly recognized, because of the BRA's review capability, the involvement of the BRA was pro-environmental.

*Judgment affirmed.*