CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC. & others[1] *vs.* DIRECTOR OF THE DIVISION OF WATER POLLUTION CONTROL IN THE DEPARTMENT OF ENVIRONMENTAL QUALITY ENGINEERING & others.[2]

Suffolk.    June 12, 1986. — July 23, 1986.

Present: GREANEY, C.J., DREBEN, & PERRETTA, JJ.

*Massachusetts Historical Commission. Back Bay Historic District. Department of Environmental Quality Engineering. Statute, Construction. Environmental Affairs.*

Where the private developers of a certain parcel of commercial real estate located partly within the Back Bay Historic District in the city of Boston were required to obtain a sewer connection permit from a State agency, the agency, in determining under G. L. c. 9, § 27C, whether "the project will affect any property listed on the state register of historic places," was not compelled to examine the entire development for possible adverse effects upon such properties, but was required to examine only that activity covered by the State permit. [549-554]

CIVIL ACTION commenced in the Superior Court Department on December 10, 1985.

The case was heard by *Cortland A. Mathers*, J., on a motion for summary judgment.

*Armond Cohen* of the District of Columbia (*Peter Shelley* with him) for the plaintiffs.

*Anne Rogers*, Special Assistant Attorney General, for Director of the Division of Water Pollution Control in the Department of Environmental Quality Engineering & another.

---

[1] Boston Preservation Alliance, Inc., and eight individuals domiciled within the Commonwealth.

[2] The executive director of the Massachusetts Historical Commission, New England Mutual Life Insurance Company, and Gerald D. Hines Interests, Inc.

*Stephen H. Oleskey* (*Stephen A. Jonas* with him) for New England Mutual Life Insurance Company & another.

GREANEY, C. J.   Originally a tidal backwash separating the Boston peninsula along its western border from the town of Brookline, the Back Bay area of Boston, in the late Nineteenth Century, was made the object of extensive land reclamation that ultimately yielded over 450 acres of dry usable land. The area, roughly described, has Commonwealth Avenue as its spine, the Boston Public Garden as its eastern boundary and the Charlesgate at its western end. It is now home to a wide variety of residential, institutional, and commerical interests, an eclectic selection of architectural styles, and a number of historical landmarks such as Trinity Church and the Boston Public Library. The area's rich background and character have led to its designation as a municipal historic district and to the district's inclusion in the State register of historic places. Now, like most areas of Boston proper, the Back Bay is undergoing a wave of renovation and new construction, including considerable commerical development.

This case concerns one new large undertaking, the so-called 500 Boylston Street development. The specific issue is whether this development, which is privately financed, requires review of the effects on the Back Bay Historic District of its total design. The review sought would be by the Massachusetts Historical Commission (commission) and is said to be required by reason of the development's need to obtain a sewer connection permit from the division of water pollution control in the Department of Environmental Quality Engineering (DEQE). The issue was raised by the plaintiffs' amended complaint in the Superior Court, which seeks, among other relief, a declaration pursuant to G. L. c. 231A, that such extensive review is required.[3] On cross motions for summary judgment, a judge of the Superior Court decided that the development was not subject to the review sought by the plaintiffs. A judgment

---

[3] Standing to sue is conferred on the plaintiffs by G. L. c. 214, § 7A, inserted by St. 1973, c. 1114, § 62, which enables "not less than ten persons domiciled within the Commonwealth" to pursue an action to prevent "damage to the environment."

entered making a declaration to that effect, and the plaintiffs have appealed.

The parties agree that the case is suitable for summary judgment. The facts are these. The development is presently being constructed by the defendants New England Mutual Life Insurance Company and Gerald D. Hines Interests, Inc., acting together as joint venturers, on a 3.15 acre parcel bounded by Berkeley, Boylston, and Clarendon Streets and St. James Avenue. The northern portion of the project fronts on Boylston Street and falls partly within the Back Bay Historic District. The site is across Clarendon Street from Trinity Church and Copley Square. As presently planned, the development will involve 1.3 million square feet of space located in a six-story low rise base and two nineteen-story towers above it. Total cost of the project is estimated at about $289,000,000. Construction apparently will proceed in two phases. Phase one, the western component of the development (approximately one-half of the total), is now underway and should be completed by the first quarter of 1988. This component will serve as a major corporate facility for New England Mutual and will also furnish significant amounts of retail and office space for other tenants. Construction phase two, the eastern component, will follow, although definitive plans for that component are still under study by the developer and governmental authority.

The potential effects of the development on its surroundings have been evaluated exhaustively in numerous public fora over the past three years. One aspect of this evaluation process has been thorough and continuing review of the potential impacts of the project on neighboring properties, both historic and nonhistoric, in terms of such concerns as design and architectural compatibility, wind and shadow effects, possible subsurface damage, parking, traffic flow and congestion, and the probable demolition of one potentially significant historic building. Review has been carried out by a number of State and municipal agencies pursuant to provisions of the Boston zoning code, the Massachusetts Environmental Protection Act (G. L. c. 30, §§ 61 et seq.), urban redevelopment statutes, the Boston Landmarks Commission Act, and many other stat-

utes, ordinances, and rules. The recommendations of the reviewing authorities have led to significant alterations in the project's design intended in part to mitigate any potentially adverse effects on historic properties.[4]

The present controversy arose about August 29, 1984, when the commission's executive director notified the developers of her opinion that DEQE, in the course of passing on the sewer connection permit, "must evaluate the [entire] project's potential effects on the historic and archaeological qualities of the State register properties." A disagreement then arose between the State officials within whose respective spheres the commission and DEQE fall,[5] over the commission's view. On May 7, 1985, the Attorney General issued a lengthy legal opinion to both the State Secretary and the Secretary of Environmental Affairs in connection with another development.[6] The Attorney

---

[4] Examples of mitigation and the nature of some of the local regulatory studies are as follows. The towers, as initially planned, were to rise twenty-five stories above the six-story base of the building along St. James Avenue. In response to comments from a "Civic Advisory Committee," established pursuant to a contract to "[i]nsure [c]ommunity [p]articipation" between the developers and the Boston Redevelopment Authority, a number of modifications were made. These included the reduction of the towers from twenty-five to nineteen stories; a consequent height reduction from 396 feet to 330 feet; an increased separation of the towers; and alterations that, among other things, resulted in a significant reduction in the development's mass. The committee's original membership consisted of the Back Bay Architectural Commission, the Back Bay Association, the Back Bay Federation, the Boston Society of Architects, the Neighborhood Association of the Back Bay, the Newbury Street League, the State Representative from the Eighth Suffolk District, and representatives of Trinity Church. A representative from the Ellis Street Neighborhood Association was later admitted to the group. The committee held over forty meetings.

The project has also received approval from the Boston Redevelopment Authority, the Boston real property board, the Boston public facilities commission and the Boston public impact commission. The mayor of Boston, the Boston city council, and the Boston air pollution commission have reviewed the project. There were also environmental impact reports that addressed the traffic, parking, transit, air quality, wind, shadow, subsurface, archaeological, historic, and visual impacts of the project.

[5] The commission is under the jurisdiction of the State Secretary, while DEQE is under the jurisdiction of the Secretary of Environmental Affairs.

[6] This opinion was "intended to be general in scope and application, [but was] informed by the particulars of a development called 'International

548 22 Mass. App. Ct. 544

Conservation Law Foundation of New England, Inc. *v.* Director of Div. of Water Pollution Control.

General concluded that, when a purely private development requires a State permit, the State agency issuing the permit · need determine only the effect on historical properties of the precise activity covered by the permit in order to satisfy the requirements of the Massachusetts Historical Commission Act (G. L. c. 9, §§ 26-27D). The DEQE followed this conclusion, and its water pollution division assessed only the impact of the sewer connection on historic properties.[7] This lawsuit followed.

General Laws c. 9, § 27C, was amended by St. 1982, c. 152, § 5, to add the following two paragraphs:

> "As early as possible in the planning process of any project undertaken by an agency, executive office, department, board, commission, bureau, division or authority of the commonwealth or of any authority established by the general court to serve a public purpose and prior to such state body funding, licensing or approving any private project, such state body shall determine if the project will affect any property listed on the state register of historic places. If the project affects a listed property, the state body shall so notify the [Massachusetts Historical] commission. Within thirty days of receiving notification, the commission shall determine if the project will adversely affect a listed property, and shall send an advisory report · to the state body describing and documenting its findings. If the commission does not notify the state body within thirty days, the state body may proceed with the project.

Place.' " Rep. A.G., Pub. Doc. No. 12, at 99 (1985). See *Boston Preservation Alliance* v. *Secretary of Environmental Affairs*, 396 Mass. 489 (1986).

[7] In considering the development's effect with regard to the requested sewer connection permit, the division also considered possible damage to an archaeological site, an ancient fishweir located beneath Boylston Street. (The fishweir was a fish trapping system used by Native Americans thousands of years ago.) The division concluded that the existence of a nine-foot buffer zone between the sewer connection and the fishweir would prevent any adverse effect on the fishweir. It also apparently was agreed that the developers would conduct an extensive archaeological investigation of the fishweir.

"If the commission finds that the project will adversely affect a listed property, the commission and the state body shall meet to discuss alternatives to the project and means of mitigating any adverse effect. The state body, in implementing its final plans, shall adopt all prudent and feasible measures that eliminate or mitigate the adverse effect."

At issue is the meaning of the term "project," which is not defined in § 27C or elsewhere in the act governing the commission, see G. L. c. 9, §§ 26-27D, as amended by St. 1982, c. 152, and St. 1983, c. 659. Specifically, we consider whether the term "project," in a situation where only a permit is required from a State agency, compels examination of the entire development for possible adverse effect[8] on a State register of historic places property,[9] or simply examination of that portion of the development subject to the State permit. In concluding that the latter was meant, the Attorney General found the statute "so vague that further legislative action is imperative." Rep. A.G. *supra* at 102. In deciding that the narrow interpretation was correct, the judge characterized the statute as "ambiguous." We agree with both observations.

For instance, the language in the first sentence of the first paragraph appears to connect the words "project undertaken" with the words "planning process" in a way which signifies agency consideration of a State development's complete design and construction. In the final sentence of the first paragraph, however, after a discussion of private projects in which the State's only involvement is the issuance of a permit, there is language that "the state body may proceed with the project." It is illogical for a State agency to be concerned with an entire

---

[8] The terms "effect" and "adverse effect" are defined in G. L. c. 9, § 26B, as amended by St. 1982, c. 152, § 6.

[9] The term "property" is not defined in the Act.

project when the agency's only role lies in limited approval, by way of the grant of a permit, of some part of it. The only "project" the State agency can "proceed with" is the grant of the permit, an act which hardly can be characterized as a "project." Grappling with the second paragraph, and the interaction between its only two sentences, produces similar frustration.[10] It may be that the meaning of the term "project" in § 27C varies directly with the level of State involvement, the required level of review diminishing based upon the degree of funding, licensing, or approval by the State. This possibility occurred to the Attorney General, whose analysis in his opinion is set forth in the margin.[11] As used in § 27C, the term "project" simply eludes a consistent definition which yields a satisfactory result. "A statute is plain and unambiguous if 'virtually anyone

[10] General lexical definitions of "project" are of no help inasmuch as the term as used in § 27C appears to contemplate (and to need) reasonably precise definition.

[11] "That the Legislature [may have] intended to differentiate among various types of developments, at least to some degree, is shown by the different procedural requirements that apply to them. Section 27C establishes different notification and mitigation requirements for projects undertaken by the state than it does for projects merely licensed by the state. (State-undertaken projects require notice of an effect on a listed property early in the state body's planning process, while state-licensed projects require notice prior to the issuance of the license.) At the end of the review process, the state body is to adopt certain mitigation measures in implementing its final plans. By its terms, this mitigation requirement can apply only to projects for which state bodies have 'plans,' namely state-undertaken projects subject to the 'planning process' referred to in the opening phrase of § 27C. State permit-granting bodies do not have a 'planning process' or 'final plans' for the issuance of permits."

To this assessment, we add the following. The language in § 27C providing for notification and mitigation could also be interpreted as a legislative attempt to treat all developments consistently. According to this interpretation, the variation in language between State-undertaken, State-funded, State-licensed or State-approved projects may reflect the fact of State intervention, not the intensity of it. Thus, all developments undertaken by the State would require commission review "[a]s early as possible," while developments involving only a State license or permit would be reviewed "[a]s early as possible . . . prior to [the] state body . . . licensing" the development. There may be a problem, as will be discussed later (at appendix [e]) with a State agency having the resources to conduct the extensive review required by the commission. Here we only note that these competing views, both of which are defensible, add to the confusion inherent in § 27C.

competent to understand it, and desiring fairly and impartially to ascertain its signification, would attribute to the expression in its context [one particular] meaning . . ., rather than any other; and would consider any different meaning, by comparison, strained, or far-fetched, or unusual, or unlikely.'" *New England Medical Center Hosp., Inc.* v. *Commissioner of Rev.*, 381 Mass. 748, 750 (1980), quoting from *Hutton* v. *Phillips*, 45 Del. 156, 160 (1949). The statute fails this test.

Finding the statute ambiguous, we turn elsewhere. We think a rational reading (and that is all we can expect to provide absent legislative clarification),[12] can be derived from the statute's legislative history, and from one of the commission's regulations adopted pursuant to the regulation-making authority conferred on it by the sixth paragraph of § 27C.

As to legislative history, we have in the record the testimony, in 1982, of the commission's then executive director before the Committee on State Administration of the House of Representatives with respect to the amendments to G. L. c. 9, §§ 26-27C, prepared by the commission, which led to the present form of § 27C. In her testimony, the executive director indicated that the proposed legislation "does not expand the powers of the . . . . [c]ommission to protect historic properties," but rather seeks to "provide[ ] a structure to ensure [that] Massachusetts' rich historic heritage will not be inadvertently distroyed by state actions." Taken at face value, the executive director's statement spurning an expansion of the commission's powers, with respect to statutory amendments drafted by the

---

[12] We note that the State Secretary has filed 1986 House Doc. No. 1569, which, among other changes, proposed that " [t]he commission's review shall not be limited to the subject matter of the license [issued by a State agency] but shall extend to the entire project whether licensed . . . in whole or in part." This amendment would appear to grant the commission the authority it seeks by way of this appeal. See also pending 1986 Senate Doc. No. 1384, which suggests considerable changes in G. L. c. 40C, the Historic Districts and Landmarks Act. We, of course, draw no inference on the issue of the interpretation of the statute from this pending legislation or from the fact that similar legislation (1985 House Doc. No. 6453), was not reported out of committee in the 1985 legislative session. See *Massachusetts Commn. Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 193-194 (1976).

commission, would leave the commission with authority no broader than what it had prior to 1982, when § 27C was amended. At that time, the Historical Commission Act, G. L. c. 9, §§ 26-27D, focused on the establishment of a registry of historic places, the duties of the State archaeologist, and the preservation of specific historic landmarks and sites.

The duty of a State agency to consult with the commission was not then found expressly in the Act,[13] but appears to have derived from the liberal reading required to be given to the Massachusetts Environmental Protection Act (MEPA), G. L. c. 30, §§ 61 et seq., as amended by St. 1977, c. 947, § 1. The MEPA places "historic districts or sites" (see the second paragraph of § 61 of c. 30) within the scope of its protection against environmental damage. In 1982, application to a State agency for a permit under the MEPA appears to have involved consideration of the project's possible impact on historic districts and sites, and, where necessary, consultation between the agencies conferring MEPA permits and the commission to mitigate any adverse effects of the work under the permit.[14] The sixth sentence of § 62A of c. 30, however, imposed the following limitation on the need for any such consultation: "In the case of a permit application to an agency from a private person for a project for which [State] financial assistance is not sought the scope of [the environmental impact] report and alternatives considered therein shall be limited to that part of the project which is within the subject matter jurisdiction of the permit."

---

[13] The only duty of this nature mentioned in the Act prior to 1982 was the commission's duty, set forth in § 26 of c. 9, to advise the State Secretary. The amendment of § 26, by St. 1982, c. 152, § 1, instructed the commission to "encourage all governmental bodies . . . to consult with [it] . . . ." The amendment contains no hint of the conferral of new powers.

[14] The first sentence of § 61 of c. 30 requires all State agencies to "review, evaluate and determine the impact on the natural environment of all . . . projects . . . to minimize damage to the environment." This requirement combined with the command in the second sentence of § 61 that all statutes are to be "administered so as to minimize" environmental damage, and with the protection afforded historic districts as part of the environment, may have imposed a pre-1982 duty to seek out the commission's expertise when a State agency had involvement with a development.

To be sure, this linkage between the the Historical Commission Act and the MEPA may have left something to be desired which the commission may have sought to rectify by the 1982 amendments. This would appear to be the reason why the commission's executive director told the Legislature that the amendments would simply provide a "structure" for consultation (which was lacking in § 27) by means of a mandate to consult or by a comprehensive set of regulations spelling out how consultation should occur. The link, sketched above, appears to define the extent of the commission's authority prior to 1982. We think it follows that the authority was limited by the language of § 62A of c. 30 quoted above. We conclude that this limitation restricted the commission's activities when only a permit was sought from a State agency. This is the only plausible way to give credence to the commission's view in 1982 (and the Legislature's apparent reliance on that view) that the proposed amendments to § 27 did not expand the commission's consultative power.[15] See *Commonwealth* v. *Germano*, 379 Mass. 268, 273 (1979).

Our decision that the term "project," in the circumstances before us, should have a narrow interpretation, receives additional support in the commission's regulations. The definition of "project" in 950 Code Mass. Regs. § 71.03 (1983) provides that " [p]rojects [under § 27C] include actions which are: . . . (c) carried out pursuant to a state . . . permit . . . ." If this regulation is literally applied to this case (as we think it should

---

[15] The commission's view in 1982 of its limited authority in circumstances like the present may also be embodied in the executive director's statement that the amendments would guard against "inadvertent" destruction caused "by state actions." The word "inadvertent" may indicate a desire to allow far more limited review of developments which are already subject to broad review by municipal authorities more directly concerned with historical preservation, such as the review that would occur where there are overlapping municipal districts (like the district in this case established pursuant to G. L. c. 40C, §§ 1-17, the Historic Districts Act), and review under St. 1975, c. 772, creating the Boston Landmarks Commission.

Moreover, the concept of damage caused by State action appears to contemplate damage directly caused by issuance of the State permit. It is hard to think of the simple act of issuing a sewer connection permit as causing the sort of damage to the whole district which the plaintiffs predict as a result of the complete development.

be) the action "carried out pursuant to" the DEQE permit is the connection of the development's waste systems to a public sewer, not the construction of the entire development. Put another way, it simply cannot be argued with any logic that the 500 Boylston Street development is licensed in its entirety by the division of water pollution control or constructed in its entirety pursuant to a permit to connect its sewers. Moreover, subsection (c) of the definition of "project" in § 71.03 stands in sharp contrast to two other categories of "actions," included as subsections (a) and (b) of the definition, in which much more substantial State involvement would appear to call for much broader commission review.[16]

We think that the various definitions of the term "project" in § 71.03, taken as a whole, may represent an effort by the commission to capture the definitions of "project" contained in the MEPA, see G. L. c. 30, § 62, and perhaps, by means of subsection (c) of the definition in § 71.03, to incorporate specifically the previously referred-to limitation contained in the sixth sentence of § 62A of G. L. c. 30A on the authority of a State agency under the MEPA.[17] We are satisfied that subsection (c) of the definition in § 71.03, whether so intended or not by the commission, narrows the scope of the commission's activities in cases where the State permit concerns a minor and discrete part of the development.

Both sides have made other arguments in support of their interpretation of § 27C. The arguments are well-reasoned and serve to point up further the inherent difficulty in attributing certainty to a statute which is beset with uncertainty. We have discussed some of the parties' additional arguments in the

---

[16] These additional definitions provide as follows:

"Projects include actions which are: (a) directly undertaken by a state Body; (b) supported in whole or in part through State contracts, grants, subsidies, loans, loan guarantees, or other forms of direct and indirect fundings assistance . . . ."

[17] In making this statement, we recognize that the definitions of "project" in § 71 also bear close resemblance to the definitions of that term contained in the regulations implementing the National Historic Preservation Act, 16 U.S.C. §§ 470f et seq. (1982).

appendix accompanying this opinion. At this point, we have enough to say that the narrow construction of § 27C is the correct one. Hereafter, any expansion of the commission's authority on facts like these is a matter for the Legislature.

*Judgment affirmed.*

### APPENDIX.

The plaintiffs make the following arguments.

(a) They contend that the language of the Act and the commission's regulations replicate key provisions of the National Historic Preservation Act, 16 U.S.C. §§ 470 et seq. (1982), and that we should follow the construction given to the Federal law. There is language in 16 U.S.C. § 470f (1982) which is very similar to that contained in G. L. c. 9, § 26-27D. Section 470f of the Federal Act, however, may be part of a more extensive scheme of historic preservation than the scheme contained in G. L. c. 9, §§ 26-27D. The Federal plan is based, in part, on a determination by Congress that existing historic preservation programs were inadequate. See 16 U.S.C. § 470(b)(5) (1982). This determination, which has not been explicitly repeated in entirely similar language in the State Act, may envision a more intrusive role for the Advisory Council on Historic Preservation. A "[d]eclaration of policy" contained in 16 U.S.C. § 470-1 (1982) may also indicate that the Advisory Council on Historic Preservation was granted greater authority than its Massachusetts counterpart. Similarly, the limits imposed by MEPA governing review of permits needed for privately financed projects finds no counterpart in the National Environmental Protection Act, 42 U.S.C. §§ 4321 et seq. (1982). See *Sierra Club* v. *Marsh*, 769 F.2d 868, 878-879 (1st Cir. 1985). These differences may make it inappropriate to follow Federal law on the subject. See *Vasys* v. *Metropolitan Dist. Commn.*, 387 Mass. 51, 54 (1982) (analogous Federal law not followed when the Federal result is dictated by some principle of Federal law not found in the law of Massachusetts). Although the parties have cited and discussed the implications of the few Federal decisions construing the National Historic Preservation Act, we do not think it is necessary to delve into the meaning of the decisions.

(b) The plaintiffs also contend that the commission has consistently interpreted its power as extending to review of an entire development when only part of the development receives a State permit. They ask us to defer to this interpretation. If the commission's interpretation is incorrect, a court will not defer to it. *Lexington Educ. Assn.* v. *Lexington*, 15 Mass. App. Ct. 749, 755 (1983). Furthermore, a comparison of the view of the commission's authority taken by its executive director in 1982, with the view taken by its present executive director reveals a lack of consistency.

(c) The plaintiffs argue that there may not be a mechanism for review in some cases if the commission is not involved. The argument overlooks the efforts of local historic district commissions which vigorously pursue their role. See, for example, *Sleeper* v. *Old King's Hwy. Reg. Historic Dist. Commn.*, 11 Mass. App. Ct. 571 (1981). In this case, the development was reviewed by a number of local authorities with historic preservation in mind. See n.4 to this opinion, *supra*.

Moreover, the Legislature can be presumed, when it enacted the amendments to G. L. c. 9, §§ 26-27C, to have been aware that municipal historic district commissions are not mandated. But that does not mean that § 27C evinces a Legislative intent to replace them with State permit granting agencies or to supplement them with permit granting agencies that act as historic district commissions. It signifies that the Legislature made a political decision to empower, but not to require, municipalities to establish their own historic district commissions. (For some areas where the Legislature has considered protection mandatory, it has enacted site-specific legislation. See e.g., St. 1956, c. 447, as amended [Lexington]; St. 1958, cc. 314 & 315 [Beacon Hill section of Boston]; St. 1960, c. 345, as amended [Concord]; St. 1963, c. 697 [authorizing establishment of municipal historical commissions]; St. 1964, c. 118 [Bedford]; St. 1965, cc. 48 [Chatham], 101 [Marblehead], & 694 [Yarmouthport]; St. 1966, cc. 211 [Petersham], 502 [Hingham]; St. 1970, c. 395 [Nantucket]; St. 1972, c. 708 [Nantucket]; St. 1975, c. 772 [Boston]; St. 1978, c. 268 [Battle Green, Lexington]; St. 1979, c. 631 [Old King's Highway].) The choice made by the Legislature weighs against, not for, the plaintiffs' interpretation because it cannot be readily assumed that the Legislature both left to municipalities the choice of having historic district commissions and then eliminated that choice by giving State permit granting agencies the functions of historic district commissions.

(d) The plaintiffs suggest that only large-scale developments will require State permits and, as a result, that it was intended that such developments be reviewed by the commission because they will necessarily have the greatest impact on historic properties. The suggestion is flawed. For example, permits from the division of water pollution control are required for all discharges of pollutants to surface water from manufacturing, commercial, mining, and point sources, from treatment works, regardless of the size of the development or the quantity of the discharge, and for all operations of terminals, regardless of their size or quantity of products dealt with. See 314 Code Mass. Regs. § 3.03(2) (1983); 314 Code Mass. Regs. § 15.07 (1985).

(e) The defendants make the point that even if the DEQE reviewed the entire development it would not have the authority to mitigate an extra-permit effect. The agency's enabling legislation does not appear to empower DEQE to impose permit conditions that are unrelated to the subject matter of the permit. See G. L. c. 21, § 43; 314 Code Mass. Regs. § 11.04(2) (1983).

Further, the DEQE's water pollution division would not have the experts needed (architects, designers, urban planners, etc.) to review a development like 500 Boylston Street and to consult with the commission and others, as would be necessary to assist in mitigation. It is not reasonable to assume that the Legislature intended agencies with specific and narrow expertise to review matters outside that expertise, especially in cases where the agency is not empowered to take action based on that review. Such review could amount to a waste of agency resources. A sounder conclusion may be that, in enacting the Historical Commission Act, the MEPA, and other statutes that regulate development in historic districts, the Legislature intended to confer the authority to review the potential effect of actions upon those entities with the power to regulate those actions. (On the other hand, it is hard to conceive of any State agency which would have available to it the kind of technical and expert assistance necessary to carry out the duties sought to be imposed by the commission's regulations. It may be that the Legislature intended to have the agency obtain any expertise it might need from the developers it regulates.)