Giles, Linda E., J.
INTRODUCTION
This is an action for judicial review pursuant to G.L.c. 30A, §14. The plaintiff, Jane Doe[1] (“plaintiff’), an elementary school teacher in a special education program, seeks review of a decision of the defendant, the Department of Children and Families (“DCF”), to support reports that she abused and neglected two of her former special needs students.
Pursuant to Mass.R.Civ.P. 12(c) and Superior Court Standing Order 1-96, the plaintiff has moved for judgment on the pleadings, which motion DCF opposes. After hearing, and for the reasons set forth below, the motion is ALLOWED.
BACKGROUND
The plaintiff holds a B.A. degree in early childhood education with a minor in behavioral science and an M.S. degree in special education. She has taught special education in a variety of settings over the last thiriy-one years; for eighteen and a half years of those thiriy-one years, she has worked in the Applied Behavior Analysis (“ABA”) field and is ABA-trained but not board-certified. During her thiriy-one years in the special education field, the plaintiff never has had a complaint lodged against her for physical abuse and/or neglect, except the instant matter under review. It is undisputed that the plaintiff is a devoted teacher, who has worked very hard with special needs children in some very difficult situations.
ABA is an empirically-driven, scientifically-based methodology for applying principles of behaviorism into shaping appropriate social behaviors and reducing maladaptive behaviors (e.g., nose-picking and toileting problems). ABA emphasizes an “Errorless Learning Model,” in which physical prompt hierarchies are used so that the student is guided physically to complete a task correctly; the prompts are faded away as the student demonstrates more independence. ABA is appropriate for implementation in a public school setting and is used with students who have deficits in communication skills and social issues.
ABA methodology for a student presenting with challenging behavior entails first taking some baseline data on the behavior (t.e., its frequency, duration, and context) and then selecting an appropriate intervention to address the behavior. To assist a student in *491 learning and completing a task, the teacher is permitted to use physical prompts, including touching, guiding, and blocking; physical restraints should be used only when the student is in imminent danger to himself/herself or others. Pushing, poking, and general rough handling are not part of the ABA protocol; however, physical prompts may be misperceived by observers who are not trained in the ABA field. Delaying lunch, not helping a student hang up his/her backpack, placing mittens on a student’s hands (to prevent, e.g., frequent nose-picking), using baby wipes on a student (knowing the student does not like the texture or smell), denying a student’s request to go to the bathroom, letting a student remain in his clothing after he/she has wet himself/herself, and requiring a student to clean up his/her urine off the floor are all recognized, permitted ABA interventions. Although a teacher can implement ABA interventions with students, best practice dictates that a Board-Certified Behavior Analyst (“BCBA”) consult with educational teams for the students.
The school district in which the plaintiff worked had elected to implement ABA strategies and intervention protocols. In September 2010, the plaintiff started her fourth year teaching the four severely disabled special needs students in question here, C.C., E.M., B.G., and D.S., in a special education program at an elementary school in Blackstone, Massachusetts. The four students were returning from summer vacation and experiencing some difficulty making the transition to a new school, new classroom, and mostly new teacher’s aides. The seven aides helping the plaintiff in her classroom were all part-time and only one was ABA-trained. A BCBA was present in the plaintiffs classroom at least two hours a week, and all four of the subject children had had a BCBA consultation.
On September 29, 2010, four separate G.L.c. 119, §51A reports, charging the plaintiff and one of her aides with abuse and neglect of C.C. and E.M. and neglect of B.G. and D.S., were filed with DCF by one of the plaintiffs new, substitute aides. As a result of the aide’s 51A reports, DCF conducted a G.L.c. 119, §5 IB investigation. Two DCF investigators, both social workers, conducted the investigation; Michael Thur-ston (‘Thurston”) was the investigator for C.C. and E.M., and Robin Marin (“Marin”) was the investigator for B.G. and D.S. The investigators interviewed four of the plaintiffs part-time aides, one of whom was a teacher, and E.M.’s mother; they did not interview the plaintiff herself. All four teacher’s aides claimed that the plaintiffs treatment of the four students was rough, inappropriate, and excessive; and those aides and E.M’s mother maintained that the students in question appeared happier after the plaintiff was removed from the classroom.[2] Neither of the DCF investigators had any knowledge of ABA protocols, so they did not inquire of the aides about their ABA knowledge or training. None of the four aides had any such training either. On completion of the 5 IB investigation, DCF found “reasonable cause to believe” that the allegations in the 51A reports were supported.
•The plaintiff requested a Fair Hearing of the agency’s action. At the hearings, which spanned three days, DCF Supervisor Sheri Gardner[3] and Thurston[4] testified on behalf of DCF; Thurston essentially recited his findings from the 5 IB investigation. Two of the plaintiffs former colleagues, both of whom are trained and experienced in ABA, DCF’s Area Program Manager, Susan Connolly (“Connolly”), the former Director of Special Education at the plaintiffs previous school, and Holly Paquette (“Paquette”), an aide who has worked with autistic students for over fifteen years at the Millville Elementary School, both attested to the plaintiffs devotion to and competency in her work and her appropriate use of accepted ABA protocols, e.g., delaying lunch, not helping a student hang up his/her backpack, placing mittens on a student’s hands (to prevent, e.g., frequent nose-picking), using baby wipes on a student (knowing the student does not like the texture or smell), denying a student’s request to go to the bathroom, letting a student remain in his clothing after he/she has wet himself/herself, and requiring a student to clean up urine off the floor. Both Connolly and Paquette asserted that, in the many years that they worked with the plaintiff, they had never seen her treat a student roughly or abusively. Paquette explained that an ABA classroom is veiy different from even a special needs room and that an observer untrained in ABA, even a regular special needs teacher, might not understand the methods used in an ABA classroom.
The plaintiff also presented the expert testimony of Ann Donovan (“Donovan”), a BCBA with extensive training and experience in the ABA field. Athough Donovan could not comment on whether the plaintiffs interactions with the students crossed the line from best practice ABA interventions into abuse or not (because she never had worked with or observed the plaintiff), she did testify that ABA is not a “one size fits all” methodology and that the intervention used is dependent on such things as the cause and severity of the behavior and whether the risks of using the intervention outweigh the benefit. The plaintiff also offered literature about ABA protocols used with the developmentally disabled; the hearing officer found that those documents served to support and clarify some of the testimony of the plaintiff and Donovan. The literature indicated that many developmentally challenged children, especially those with autism, need a great deal of physical prompts; that overcorrection is a procedure developed to help reduce aggressive, disruptive, and inappropriate behaviors in such developmentally disabled persons; and that sometimes teachers have to be strict and authoritative, no matter how harsh that might sound.
*492 In her decision,[5] the hearing officer upheld the DCF’s decision to support the allegations of abuse and neglect of C.C. (a non-verbal ten-year-old, who was diagnosed with both Down’s Syndrome and autism and who often wet himself to avoid doing tasks) and E.M. (a seven-year-old who was diagnosed with a rare genetic disorder, “Criduchat Syndrome,” which limits her verbalization, leaves her limbs lacking in tone, and causes developmental delays) but reversed the agency’s decision to support the allegations of neglect of B.G. and D.S. The hearing officer found “reasonable cause to believe” that the plaintiff had abused C.C. by handling him roughly; slamming his hands on the desk; and pushing C.C.’s chair intp him, forcing his body into the desk, and holding the side of his head against the desk. The hearing officer found “reasonable cause to believe” that the plaintiff had neglected C.C., a non-verbal, emotionally needy special needs student, by handling him roughly, delaying his lunch, forcing him to clean up his own urine, being verbally aggressive, making him sit in urine-soaked clothing for thirty to forty-five minutes, and failing to provide positive reinforcement. The hearing officer found “reasonable cause to believe” that the plaintiff had abused E.M. by handling her roughly, although there was no evidence that the plaintiff physically injured the child. The hearing officer found “reasonable cause to believe” that the plaintiff had neglected E.M., also an emotionally needy special needs student, by slamming her hand down on the desk; poking, pushing, and prodding her; holding her chin and twisting her head; pulling her up off the floor roughly by the arm; holding her in a wrap-around restraint; forcing her to wear mittens held down by tape or elastic bands (to prevent her from picking her nose); making her wait to go to the bathroom; having her parents come change their daughter’s urine-soaked clothing; and not allowing her to speak in the hallway. The instant action for judicial review of that decision ensued.
DISCUSSION
I. Judicial Review Standard
Judicial review under the Administrative Procedures Act is narrow and deferential to the agency, Buchanan v. Contributory Ret. Appeal Bd., 65 Mass.App.Ct. 244, 246 (2005); but it is not abdication, Arnone v. Commissioner of Dept. of Soc. Servs., 43 Mass.App.Ct. 33, 34 (1997). A court may set aside an agency decision only if the court determines that the substantial rights of any party may have been prejudiced because the decision is in violation of constitutional provisions; in excess of statutory authority or jurisdiction of the agency; based upon an error of law; based on unlawful procedure; unsupported by substantial evidence; unwarranted by facts found by the court on the record as submitted; or arbitrary, capricious, or an abuse of discretion. G.L.c. 30A, §14(7)(a)~ (g) (2001). “Substantial evidence” is “such evidence as a reasonable mind might accept as adequate to support a conclusion,” taking “into account whatever in the record detracts from its weight.” Lycurgus v. Director of Div. of Employment, 391 Mass. 623, 627-28 (1984), quoting New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456, 466 (1981). See G.L.c. 30A, §1(6). Any evidence may be considered and relied upon by the examiner “if it is the kind of evidence on which reasonable persons are accustomed to rely in the conduct of serious affairs.” G.L.c. 30A, §11(2). ‘This standard is highly deferential to an agency . . .” Ten Local Citizen Group v. New England Wind, LLC, 457 Mass. 222, 228 (2010). However, a decision does not satisfy the “substantial evidence” requirement if “the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary.” Cobble v. Comm’r of Dept., of Social Servs., 430 Mass. 385, 390-91 (1999), quoting New Boston Garden Corp., 383 Mass. at 466.
The party challenging the agency’s decision bears the burden of demonstrating the invalidity of the administrative determination. Merisme v. Bd. of Appeals of Motor Vehicle Liab. Policies & Bonds, 27 Mass.App.Ct. 470, 474 (1989). The court must give “due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” Doe, SORB No. 10216 v. SORB, 447 Mass. 779, 787 (2006), quoting G.L.c. 30A, §14(7). Nevertheless, “(tjhe principle of according weight to an agency’s discretion . . . is ‘one of deference, not abdication.’ ” Moot v. Dep’t of Envtl Protection, 448 Mass. 340, 346 (2007), quoting Boston Preservation Alliance, Inc. v. Sec. of Envtl. Affairs, 396 Mass. 489, 498 (1986).
II. Analysis
It is uncontroverted that the plaintiff spent her lengthy career dealing with special needs children often exhibiting challenging and maladaptive behaviors. Many of the children in her charge were severely developmentally delayed and non-verbal, such that verbal prompts were ineffective. Thus, resort to physical prompts pursuant to the ABA protocol was required for this population of students with intensive special needs, who had difficulty self-regulating and quickly could become frustrated and agitated to the point where they might be a danger to themselves or others. Because these students did not necessarily have the ability to complete certain basic life skills, physical prompts helped them perform those skills.
A careful review of the entire administrative record indicates that there was no substantial evidence to support DCF’s conclusion that there was “reasonable cause to believe,” 110 C.M.R. §4.32(2), that the plaintiff had abused and neglected C.C. and E.M. Indeed, the cumulative weight of the evidence tended substantially toward the opposite conclusion. Cobble, 430 Mass. at 391. To begin with, the initial 51A report here strikes this court as highly questionable. The investigation of the plaintiffs teaching methods was triggered by the report of a new, substitute, part-time teacher’s *493 aide without any prior experience with the plaintiff or in the ABA field. That reporter filed her 51A report against both the plaintiff and one of her aides after working only a few weeks working with them. After the 51B investigation, half of that reporter’s targets and half of her allegations were thrown out as unsubstantiated.
Furthermore, it is extraordinaiy to this court that neither of the investigators, nor any of the part-time teacher’s aides interviewed, nor E.M.’s mother, nor presumably the hearing officer herself had any credentials, training, or experience in the ABA field, despite the fact that the hearing officer found that “physical prompts could be misperceived as [rough handling] by somebody] ] who observed [ABA interventions or approaches] and [was] not trained in the ABA field.” This finding was corroborated by Donovan, an ABA expert, who testified that, to the untrained eye, ABA interventions and protocols could appear abusive; and Paqu-ette explained that an observer untrained in ABA, even a regular special needs teacher, might not understand the methods used in an ABA classroom. Moreover, contrary to Thurston’s doubtful position, the context within which the abuse and neglect is alleged to have occurred is highly material. Thus, the potential for misinterpretation by these inexperienced observers, investigators, parent, and hearing officer of nuanced, refined interactions between the plaintiff and her special needs students was huge.
The hearing officer dismissed this legitimate concern for the untrustworthiness of the aides’ assertions with a factually unsupported conclusion: “The Hearing Officer is not convinced that all of the aides’ observations, which comprise a general theme of excessive handling, were due to a lack of understanding of ABA protocols.” It seems that the hearing officer took the position that four teacher’s aides who provided consistent assessments must be right. However, “the quality or strength of the proof is not determined by the sheer volume of evidence or the number of witnesses or exhibits. It is the weight of the evidence, its strength in tending to prove the issue at stake, that is important. [It] might [be found] that a smaller number of witnesses who testify to a particular fact are more believable than a larger number of witnesses who testify to the opposite.” Mass. Superior Court Civil Practice Jury Instructions, §1.2.6, 2nd ed., 1st supplement 2011. It must be noted that, consistent with lawful procedure, none of the plaintiffs accusers testified at the Fair Hearing; however, “ [substantial evidence may be based on hearsay alone if that hearsay has ‘indicia of reliability.’ ” Covell v. Dept of Social Servs., 439 Mass. 766, 786 (2003). This court concludes that the aides’ unreliable empirical judgments, offered through Thurston, should have been accorded little weight.
Further detracting from the weight that should have been granted the aides’ statements was the ample evidence in the plaintiffs favor. The plaintiff spent her lengthy career dealing -with special needs children often exhibiting challenging and maladaptive behaviors. It was uncontroverted that the plaintiff was a devoted teacher with a heretofore blemishless record. Donovan, an expert in the ABA field, attested to the fact that all the physical prompts and behavioral interventions employed by the plaintiff were valid, recognized ABA methodologies, including, inter alia, delaying lunch, not helping a child hang up his/her backpack, placing mittens on a child’s hands, forcing a child’s hand down, moving or guiding a child’s head or body, denying a child’s request to go to the bathroom, letting a child remain in his/her clothing after he/she had wet himself/herself, and requiring a child to clean up urine off the floor; indeed, Donovan testified that, given the severity of the disabilities in the plaintiffs students, she would have expected more physical prompting. Both Connolly and Paquette, who had worked with the plaintiff for years, not merely a few weeks, corroborated her caring and proper use of ABA interventions.
There was no report of physical injury “(a) death; or (b) fracture of a bone, a subdural hematoma, burns, impairment of any organ, and other such nontrivial injury; or (c) soft tissue swelling or skin bruising,” 110 C.M.R. §2.000, or emotional injury (impairment or “disorder of the intellectual or psychological capacity of a child as evidenced by observable and substantial reduction in the child’s ability to function,” 110 C.M.R. §2.00, to the children in question. It was undisputed that frequent and forceful physical conduct was permitted under ABA protocols; axiomatically, then, the “substantial risk of physical or emotional injury,” 110 C.M.R. §2.00, to a child undergoing an ABA intervention would be higher. DCF’s reliance on non-ABA-related cases that turn on the presence of visible marks or bruises is inapposite. See, e.g., Wilson v. Dept. of Social Servs., 65 Mass.App.Ct. 725, 742, 747 (2006).
In what seemed to be tantamount to burden-shifting, the hearing officer found that the plaintiff had not proved that her conduct conformed to ABA protocols because she had failed to substantiate her claim through data sheets or proof that she had developed ABA protocols or interventions for C.C.’s and E.M.’s bad behaviors, had obtained parental consent for such protocols or interventions, or had consulted with a BCBA. However, the fact that the plaintiff may have been a poor record-keeper or may have failed to observe procedural requirements does not mean she abused or neglected either C.C. or E.M. Moreover, Donovan’s inability to observe the plaintiffs classroom performance owing to the plaintiffs immediate removal after the 51A report was lodged should not be held against the plaintiff. Finally, the mere observation that the subject children appeared happier after the plaintiff was placed on leave, without more, is conflating correlation with causation, especially considering *494 that the students’ post-summer difficulty in transitioning to a new setting and new teacher’s aides likely vanished over time.
ORDER
For all the foregoing reasons, it is hereby ORDERED AND ADJUDGED that the plaintiffs motion for judgment on the pleadings be ALLOWED and that DCF’s decision to support the charges against the plaintiff of abuse and neglect as to C.C. and E.M. be REVERSED.[6]

 A pseudonym.

 Criticisms of the way the plaintiff conducted herself in the classroom also came from two parents of children whose 51A reports were not substantiated.

 It is not clear what, if anything, this witness contributed to the evidence in the record.

 The other investigator, Marin, no longer worked for DCF at the time of the Fair Hearing. It is noteworthy that only the charges of Thurston, the investigator for C.C. and E.M. and the only investigator who testified at the Fair Hearing, were substantiated and those of the absent investigator, Marin, were not.

 The court finds that the hearing officer’s writing style somewhat convoluted in that it intersperses ambiguously the evidence from the 51A reports, the 5IB investigation, and the Fair Hearing and fails to distinguish clearly actual findings of fact from a mere recitation of the evidence.

 Having so determined, the court need not reach the plaintiffs additional argument that DCF erred in not providing her with timely notification that it had supported the 51A report. See C.M.R. §4.33(3).