408         447 Mass. 408 (2006)

Springfield Preservation Trust, Inc. v. Springfield Library and Museums Association, Inc.

SPRINGFIELD PRESERVATION TRUST, INC.[1] vs. SPRINGFIELD
LIBRARY AND MUSEUMS ASSOCIATION, INC., & another.[2]

Hampden. April 7, 2006. - August 14, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Historic District Commission,* Appeal. *Zoning,* Validity of by-law or ordinance,
Exemption. *Res Judicata. Moot Question. Practice, Civil,* Historic district
appeal, Moot case, Waiver.

A civil action seeking, inter alia, a declaration that a particular exemption in a
city's zoning ordinance was invalid was not barred by the doctrine of res
judicata, where an earlier suit challenging the validity of the ordinance was
decided on grounds having nothing to do with the merits of the controversy,
and no preclusive effect could be attributed to the decree in that case
[416-417]; further, the case was not moot where, although the house at the
center of the controversy had been demolished, the demolition did not
eliminate the controversy between the parties [417-418].

The portion of a city's zoning ordinance that exempted from the authority of
the city's historic district commission any buildings, structures or proper-
ties however owned or controlled by a library and museums association
(association) or the Roman Catholic diocese of the city (diocese) was valid
to the extent that it applied to property within the historic district that was
owned or controlled by the diocese or the association at the time the
ordinance was adopted, but could not lawfully apply to property within the
historic district that was subsequently acquired by the diocese or the
association. [418-424] IRELAND, J., dissenting, with whom SPINA and COWIN,
JJ., joined.

In a civil action seeking, inter alia, a preliminary injunction to prevent the
demolition of a house and a judgment declaring that a particular exemption
in a city's zoning ordinance was invalid, the judge erred in denying the
plaintiff's request for further hearings on the issue of remedies, where the
plaintiff, which prevailed in part on the claim that the exemption was

---

[1]Peter Jarrett was also a party to the complaint. Jarrett has not appealed
from the ruling below that he lacks standing, and therefore he is not a party to
this appeal. The decision that the plaintiff Springfield Preservation Trust, Inc.
(trust), has standing has not been challenged on appeal. In this opinion, we
shall refer to the trust as the only plaintiff.

[2]The bishop of the Roman Catholic diocese of Springfield. The city of
Springfield, the chair of the Springfield Historical Commission, and the
Springfield Historical Commission were also defendants and had appealed to
the Appeals Court. Subsequently, their motion for voluntary dismissal was
granted by that court.

invalid, did not waive its rights to request further remedies. [424-425]
IRELAND, J., concurring, with whom SPINA and COWIN, JJ., joined.


CIVIL ACTION commenced in the Superior Court Department on
February 8, 2001.

The case was heard by *C. Brian McDonald*, J., on motions
for summary judgment and a motion for partial summary
judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Mark D. Mason* for Springfield Library & Museums Associa-
tion, Inc.

*John J. Egan* for Roman Catholic Bishop of Springfield.

*John Egnal*, of Pennsylvania (*Terry Scott Nagel* with him) for
the plaintiff.

SOSMAN, J. In 2003, a Superior Court judge (motion judge)
declared invalid the second sentence of § 2.46.030(A) of the
Revised Ordinances (ordinance) of the city of Springfield (city),
which exempted from the authority of the Springfield Historical
Commission (commission) "any buildings, structures or proper-
ties however owned or controlled by the Springfield Library and
Museum Association [(association)] and Roman Catholic Bishop
of the Diocese of Springfield [(diocese)]." The motion judge
determined that the exemption, based on the identity of a property
owner, was not authorized by the Historic Districts Act, G. L.
c. 40C (Act). While ruling in favor of the plaintiff, Springfield
Preservation Trust, Inc. (trust), with respect to declaratory relief,
the motion judge denied the trust's request for further hearing
with respect to any additional remedies. All the defendants ap-
pealed (see note 2, *supra*), and the trust cross-appealed. We
transferred the case to this court on our own motion and now
conclude that the second sentence of the ordinance is valid to the
extent that it applies to property owned or controlled by the
diocese or the association at the time the ordinance was adopted.
We agree, however, that the second sentence cannot lawfully ap-
ply to after-acquired property, and we therefore interpret it as not
applying to any such after-acquired property. Here, based on an
erroneous interpretation of the ordinance, the commission al-

lowed the demolition of property that the association acquired long after the ordinance was adopted. We conclude that the trust is entitled to a hearing concerning further remedies. Accordingly, we vacate the final judgment and remand the case for further proceedings consistent with this opinion.

1. *Overview of the Act.* The Act permits cities and towns to establish historic districts to preserve "distinctive characteristics of buildings and places . . . or their architecture." G. L. c. 40C, § 2. Within a historic district, buildings or structures may not be constructed or altered in a manner that "affects exterior architectural features" without first submitting the proposed construction or alteration for review by the historic district commission.[3] G. L. c. 40C, § 6. See G. L. c. 40C, § 10 (*a*)-(*c*). A historic district commission is to consider various factors in deciding whether to issue a certificate, including "the historic and architectural value and significance of the site, building or structure . . . and the relation of . . . features to similar features of buildings and structures in the surrounding area." G. L. c. 40C, § 7. A historic district commission is not to make recommendations or impose requirements "except for the purpose of preventing developments incongruous to the historic aspects or the architectural characteristics of the surroundings and of the historic district." *Id.*

However, an ordinance or bylaw creating a historic district may provide that the historic district commission shall not have authority over certain "categories of buildings or structures or exterior architectural features," with the permissible list of such excluded "categories" expressly identified in the Act. G. L. c. 40C, § 8 (*a*).[4] It may also provide that a historic district commission's authority be limited to those exterior architectural features that may be seen from specified locations. § 8 (*c*).

---

[3]Following its review, a historic district commission may issue a certificate of appropriateness, nonapplicability, or hardship with respect to the proposed construction or alteration. G. L. c. 40C, § 6.

[4]Specifically, an ordinance may exclude from review temporary structures or signs, terraces, walks, driveways, sidewalks, walls, fences, storm doors and windows, screens, window air conditioners, lighting fixtures, antennae, color of paint, color of roofing materials, signs of a certain size, and the reconstruction of substantially similar exterior design of features destroyed by fire, storm, or other disaster. G. L. c. 40C, § 8 (*a*) (1)-(8).

In order to create a historic district, a historic district study committee (or an already existing historic district commission) must investigate and report on "the historical and architectural significance of the buildings, structures or sites to be included in the proposed historic district." G. L. c. 40C, § 3. "The buildings, structures or sites to be included in the proposed historic district may consist of one or more parcels or lots of land, or one or more buildings or structures on one or more parcels or lots of land." *Id.* After completion of the report, the study committee is to hold a public hearing, giving notice thereof to owners of property that would be included in the proposed district. *Id.* After hearing, the study committee must submit to the city council or town meeting its final report and recommendations, a map of the proposed district, and a draft ordinance or bylaw. *Id.* A two-thirds vote of the city council or town meeting is then required to adopt the ordinance or bylaw creating the district. *Id.* However, the ordinance or bylaw does not "become effective until a map . . . setting forth the boundaries of the historic district" has been filed with the city or town clerk and recorded in the registry of deeds. *Id.*

Once established, a historic district "may be enlarged or reduced . . . in the manner provided for creation of the initial district," with the historic district commission conducting the investigation, report, and public hearing. *Id.* If the district is being reduced, notice of the public hearing must be sent to all owners of property in the district. *Id.* As with the creation of the original district, an ordinance or bylaw "changing the boundaries" of a historic district is not effective until a map setting forth the changed boundaries has been filed with the clerk and recorded in the registry of deeds. *Id.*

2. *Facts and procedural background.* In 1972, the city established the Quadrangle-Mattoon Street Historic District (district) by adopting the ordinance.[5] As required by the Act, the adoption of the ordinance was preceded by an investigation and report by a historic district study committee. That report put forth three alternate proposals for the district. The option favored by the committee was one that would establish the district

---

[5]The ordinance also established a historic district commission, as well as other historic districts.

with "full controls over exterior architectural features viewed from all streets in [the] district." Another option would establish the same district but exclude from the commission's authority those features that could be viewed from certain locations, which would effectively exclude certain buildings or portions of buildings located in what is referred to as "the Quadrangle." (Several museums and a library are located in the Quadrangle.) The final option, least favored by the committee, would define the boundaries in a manner that eliminated the entirety of the Quadrangle property itself.

The ordinance as ultimately adopted established the district with boundaries that would include the Quadrangle, but then, citing G. L. c. 40C, § 8 (*b*), excluded from the commission's authority "any buildings, structures or properties however owned or controlled by the [association] and the [diocese]." A map reflecting the district's boundaries was filed and recorded. That map shows the location of buildings within the district, property lot lines, and names certain of the properties therein (including the library, several museums, St. Michael's cathedral, St. Joseph's convent, and the rectory). At no time since the adoption of the ordinance has the city taken the required steps to enlarge or reduce the district.

One Frances M. Donoghue owned a house and land located at 67-69 Chestnut Street (the Donoghue property), a site within the boundaries of the district, and in 1984, she deeded it to the association. In 1991, the commission requested an opinion from the city's law department with respect to the interpretation of the ordinance's exclusion of property owned by the association or the diocese, specifically asking whether the Donoghue property had become "exempt" from the commission's authority as a result of its transfer to the association. The commission's inquiry noted that if the transfer of property to the association or the diocese rendered that property no longer subject to the commission's authority, the commission would "repeatedly play 'musical chairs' " with each such transfer and that, hypothetically, the entirety of the district could evade the commission's review if all the property in it were acquired by either the association or the diocese. Noting that anomaly, the commission asked: "Was this the actual intent of the [o]rdinance?

Or does the exemption apply to ownership at time of [o]rdinance approval in 1972?"

The assistant city solicitor who responded to the commission's inquiry found no guidance from the history of the ordinance itself: "Unfortunately, no explanation of this provision is given or recorded as to the intent or scope of the law, which is why the issue is now clouded for the commission." Because there was "no recorded history to the [o]rdinance, and therefore, no known intent or scope," and no case law interpreting the ordinance, the law department recommended a "literal reading" of the provision exempting property of the association and the diocese. Under that "literal" interpretation, the assistant city solicitor opined that property originally subject to the commission's authority would cease to be subject to that authority if it were acquired by the association or the diocese, and that property exempt from the commission's authority on account of ownership by the association or the diocese would become subject to the commission's authority if it were transferred to another party. Accordingly, the assistant city solicitor advised the commission that the Donoghue property was no longer subject to the commission's authority.

On January 29, 1998, the association wrote to the chair of the commission indicating that the association intended to allow a third party to relocate the house on the Donoghue property to another site. In that letter, the association expressed the view that the Donoghue property was "covered by the exemption" set forth in the ordinance, and asked the commission to "verify this understanding." After the commission's consideration of the matter at a subsequent meeting, the chair wrote to the association on February 9, 1998, confirming that the commission agreed that the exemption in the ordinance extended to the Donoghue property.

On December 20, 2000, the association again wrote to the commission, indicating that it needed a formal vote on the issue and the requisite certificate from the commission in order to obtain permits with respect to the disposition of the house.[6] The commission considered the association's request for a certificate

---

[6] A demolition permit for a building in a historic district may not be issued until the applicant has obtained a certificate of appropriateness, a certificate of

of nonapplicability at its meeting on January 4, 2001. Five of the commission's six members were present. Two members voted in favor of granting the certificate, one member voted against, and two members abstained. Before issuing any certificate based on this split vote, the chair of the commission again contacted the city's law department asking whether the commission was required to issue the requested certificate of nonapplicability and whether the commission was required to give effect to the exemption in the ordinance "even if the [members] find it unpalatable." The chair's inquiry reported that certain commission members "insisted on the need to 'clarify' " the exemption and wanted to know whether the 1991 opinion from the assistant city solicitor on the subject was "still valid" or "old and outdated." The city solicitor replied by letter dated January 29, 2001, advising the commission that it was required to issue the certificate of nonapplicability, that the members were required to follow the terms of the ordinance "even if they do not agree with them," and that the opinion given to the commission on the subject back in 1991 was "still valid."[7] Based on that opinion, the commission proceeded to issue a certificate of nonapplicability for the Donoghue property on January 31, 2001, and the association obtained a demolition permit from the city's building department on February 13, 2001.

On February 8, 2001, the trust, a nonprofit charitable corporation organized under G. L. c. 180,[8] filed a complaint requesting, in relevant part, a preliminary injunction to prevent the demolition of the house, a declaration that the ordinance's exemption

nonapplicability, or a certificate of hardship from the governing historic district commission. G. L. c. 40C, § 6. Thus, despite the prior confirmation by letter that the house was not subject to the commission's authority, the association needed a certificate of nonapplicability in order to obtain a demolition permit.

[7] The city solicitor's letter added that although the ordinance cited G. L. c. 40C, § 8 (*b*), as the authority for the exemption, the actual authority for the exemption stemmed from the grant of powers and authority set forth in G. L. c. 40C, § 10 (*i*) ("The commission shall have, in addition to the powers, authority and duties granted to it by this act, such other powers, authority and duties as may be delegated or assigned to it from time to time by vote of the city council or town meeting").

[8] One of the purposes of the trust is the preservation of the city's historic property.

was invalid, and "such other and further relief as this Court deems just and proper." The trust's request for a preliminary injunction was denied on February 28, 2001. There was no appeal from the denial of the preliminary injunction, and the property was subsequently demolished.

The association filed a motion to dismiss or, in the alternative, for summary judgment, and the trust filed a cross motion for summary judgment. Following an initial hearing at which various procedural issues were discussed, a judge (not the motion judge) issued an interim order reciting the trust's acknowledgment at that hearing that the "only claim remaining" in the case was the "alleged illegality" of the ordinance.[9] All parties were allowed additional time to address that claim. The trust filed a motion for partial summary judgment against all defendants on that portion of the complaint seeking declaratory relief,[10] and all the defendants filed their respective oppositions to the trust's motion for partial summary judgment.

In his amended memorandum of decision, the motion judge rejected the defendants' assertions that the trust's claim was barred by res judicata, and implicitly rejected the argument that the claim was moot following the demolition of the property. Turning to the merits of the trust's statutory arguments (see note 10, *supra*), the motion judge analyzed the relevant statutory provisions of the Act, concluding that the exemption was a "flagrant betrayal of the statutory purpose" because the exemption did not "further the ends of 'preservation and protection.' " Referencing the 1991 opinion of the city's assistant solicitor, the motion judge noted that the application of the exemption to after-acquired property made possible the acquisition and demolition of build-

---

[9] The original complaint included an additional claim that the certificate of nonapplicability had been issued without the requisite majority vote. That claim was waived, as reflected in the interim order.

[10] The original compliant had also claimed that the ordinance exemption denied the plaintiffs (see note 1, *supra*) equal protection of the laws. In its motion for summary judgment, the trust expressly "abandoned the claim that [the] ordinance is unconstitutional." Its remaining claim that the ordinance exemption was invalid was based exclusively on the theory that the exemption was not authorized by (and was indeed violative of) G. L. c. 40C. Thus, by the time of the trust's summary judgment motion, the sole ground of "alleged illegality" was that the ordinance did not comply with the enabling statute.

ings that would otherwise be protected, and that nothing prohibited the association and the diocese from eliminating every building in the district through such acquisition and demolition. The motion judge further noted that the exemption allowed this reduction in the size of the district without following the procedures required by G. L. c. 40C, § 3. He concluded, inter alia, that the Act does not authorize exemptions based on ownership and control of property; the Act contained an "implication that a historic district is a geographical unit, a mappable entity, consisting of blocks, streets, and buildings, with exterior features and other tangible elements," and lacked any reference to "legal concepts" such as ownership. The motion judge therefore declared the exemption invalid.

After the association and the diocese filed notices of appeal, the trust filed an emergency motion to stay the assembly of the record, arguing that it had only moved for partial summary judgment on the underlying legal issue and that it had preserved its rights with respect to remedies in both its complaint and its motion for partial summary judgment. The trust requested a status conference to address the matter of appropriate remedies. After a hearing, the trust's motion was denied.

3. *Discussion.* On appeal, the association and the diocese argue that (1) the trust's claim was barred by the doctrine of res judicata; (2) the trust's claim is moot; (3) the exemption was authorized by the Act; and (4) even if the exemption was not authorized, the motion judge improperly severed the exemption from the rest of the ordinance. In its cross appeal, the trust argues that the motion judge erred in not allowing it to pursue further remedies. We consider each argument in turn.

a. *Res judicata.* The diocese argues that the trust's claim is barred by the doctrine of res judicata because the trust had unsuccessfully challenged the validity of the ordinance in prior litigation. *Springfield Preservation Trust, Inc.* v. *Roman Catholic Bishop of Springfield*, 7 Mass. App. Ct. 895 (1979). In that case, a Superior Court judge had concluded that the ordinance was valid and had allowed the defendants' motions to dismiss. The plaintiffs appealed from the denial of their claim for declaratory relief that the exemption was invalid. *Id.* The appeal

was decided on procedural grounds,[11] and the court specifically stated that it did "not reach the other questions raised." *Id.* The diocese nevertheless argues that we should focus on the words "Judgment affirmed" at the conclusion of the Appeals Court's opinion. It argues that the Appeals Court affirmed the judgment below (that the ordinance was valid), and thus there has been a prior adjudication of the ordinance's validity on the merits. We disagree. While the lower court had addressed the merits of the trust's claim, the case was ultimately decided on other grounds having nothing to do with the merits (see note 11, *supra*). "It is settled . . . that no [preclusive] effect can be attributed to a decree dismissing a bill or petition in equity, for want of jurisdiction or any other cause not involving the essential merits of the controversy." *Curley* v. *Curley*, 311 Mass. 61, 66 (1942). See *Hartford Acc. & Indem. Co.* v. *Commissioner of Ins.*, 407 Mass. 23, 29-30 (1990) (rejecting res judicata argument where commissioner was without jurisdiction to hear claims). See also *Jarosz* v. *Palmer*, 436 Mass. 526, 533 (2002).[12]

b. *Mootness.* The diocese also argues that because the trust did not appeal from the denial of injunctive relief to prevent the house from being demolished, the trust's claim is moot, and thus, the motion judge erred in considering the trust's motion for summary judgment. We disagree. In addition to requesting injunctive relief concerning the demolition, the complaint requested, in pertinent part, a declaration that the ordinance is invalid and void. The demolition of the house did not eliminate the controversy between these parties — the association continues to own the Donoghue property; the diocese and the association

---

[11]Specifically, the trust had failed to join the city of Springfield as a necessary party and to notify the Attorney General of the suit, as required by G. L. c. 231A, § 8. *Springfield Preservation Trust, Inc.* v. *Roman Catholic Bishop of Springfield*, 7 Mass. App. Ct. 895 (1979).

[12]We also note that the prior litigation concerned the demolition of St. Joseph's convent, property owned or controlled by the diocese at the time the district was created in 1972. That case did not address, even before the lower court, whether the ordinance should be interpreted to apply to property acquired by the diocese or the association after the adoption of the ordinance, or whether such an interpretation of the ordinance would violate the Act. As discussed *infra*, the distinction between property owned by the diocese or the association at the time the ordinance was adopted and property later acquired by those parties is a crucial one.

own other property in the district; and, when applied to after-acquired property (as occurred here), the exemption would cover even more property in the district if such property were to be acquired by the diocese or the association. The validity of the ordinance was properly considered by the motion judge. Contrast *Building Comm'r of Cambridge* v. *Building Code Appeals Bd.*, 34 Mass. App. Ct. 696, 697 (1993) (appeal moot where sole issue was board's order to issue demolition permit; commissioner subsequently complied with order and building had been demolished).

c. *Validity of the exemption.* Local regulations are presumed valid, unless they exceed the authority conferred by the enabling statute or the Home Rule Amendment (art. 89 of the Amendments to the Massachusetts Constitution). *Beard* v. *Salisbury*, 378 Mass. 435, 439-440 (1979). A municipality may have powers not expressly granted in an enabling statute, if they are "essential and not merely convenient to the implementation of express powers conferred by statute." *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870, 877 (1986). Plaintiffs bear a heavy burden in demonstrating that a local ordinance exceeds statutory authority. *Grace* v. *Brookline*, 379 Mass. 43, 49-50 (1979).

The ordinance itself cites § 8 (*b*) of the Act as authority to enact the exemption. Section 8 (*b*) allows a historic district commission itself to exempt "categories of exterior architectural features, colors, structures or signs," including but not limited to the categories itemized in § 8 (*a*). Here, the commission did not adopt the exemption at issue — it was stated in the ordinance itself — and the exemption of entire buildings and properties goes far beyond an exemption of "exterior architectural features, colors, structures or signs." Nor can the exemption be authorized by § 8 (*a*). Although § 8 (*a*) pertains to exemptions that may be set forth in the ordinance, the list of permissible exemptions is quite specific, and would not cover the exemption at issue here (see note 4, *supra*).

The association argues that § 10 (*i*) offers the actual authorization for the exemption. We disagree. Section 10 (*i*) grants a municipality the authority to give *additional* powers or

duties to a historic district commission.[13] The exemption here excludes property within the district from the commission's power to review. It takes away the commission's powers and duties; it does not add to them.

However, the Act gives municipalities unfettered discretion whether to establish a historic district and, if so, what lands, buildings, and structures to include in that district. G. L. c. 40C, § 3. No matter how great its historic or architectural significance, nothing compels a municipality to include a particular property within a historic district, and nothing in the Act limits the permissible reasons for placing a particular property or properties outside the district. Properties may be excluded from a historic district either by the placement of the boundary lines pursuant to § 3, or they may be made exempt from review based on whether they can be seen from particular locations pursuant to § 8 (c). Thus, when a historic district is created, the municipality may vote to exclude or exempt whatever properties it wishes, and its reasons for doing so — i.e., on account of who owns a particular property — are beyond review.

Here, the initial proposals for the district included a proposal for different boundaries (which would have excluded the entire Quadrangle, and the association's properties located in the Quadrangle) and a proposal with limitations based on lines of sight (which would also have exempted much of the Quadrangle and the association's properties). Ultimately, the city council determined that it did not want the district to include specific properties, namely, the specific properties owned or controlled by the diocese or the association. Those properties could unquestionably have been excluded from the district or from the commission's authority by either drawing irregular boundaries or by crafting complex sight-line determinations and measurements. In short, the city council's determination that it did not want these properties to be in the district or subject to the commission's authority was a perfectly lawful one, and the statute permitted the district to be created in a fashion that reflected that determination.

[13]General Laws c. 40C, § 10 (i), states: "The commission shall have, in addition to the powers, authority and duties granted to it by this act, such other powers, authority and duties as may be delegated or assigned to it from time to time by vote of the city council or town meeting."

The issue, then, is simply whether the manner in which the city council excluded these properties — identifying them by their ownership, instead of by their physical location or visibility from particular vantage points — now compels us to include in the district properties that the city council clearly did not want to include. We think not. That the ordinance uses a shorthand reference for identifying these properties does not make it impermissible for us to honor the intent of the ordinance that they not be part of the district. The properties that were owned or controlled by the diocese or the association at the time the ordinance was adopted in 1972 are tangible, identifiable properties, and they may be excluded from the district without violating any aspect of the Act.

The trust correctly points out that the map of the district, as filed and recorded, delineates the physical boundaries of the district, and that properties of the diocese and the association are within those boundaries. While certain properties of the association and the diocese are identified on that map with titles (e.g., the "Museum of Fine Arts," "St. Michael's Cathedral"), making it readily determinable that they would be covered by the exemption, the exemption itself is not reflected on the map in any fashion, nor, from titles alone, could one necessarily identify the entirety of properties owned or controlled by the diocese or the association. In that sense, the map does not completely and accurately reflect the terms of the ordinance.

That it does not do so, however, does not operate to override or invalidate the exemption. To begin with, the map of a historic district will not necessarily reflect all of the pertinent exclusions — for example, if portions of a district have been excluded from a historic district commission's authority pursuant to § 8 (*c*) (based on the fact that architectural features may not be seen from identified locations), nothing on the map of the district will necessarily reflect that certain buildings or properties have been exempted from review by the historic district commission.

Moreover, to the extent that a map is inaccurate or incomplete, it does not appear that the map would trump the terms of the ordinance itself. Indeed, the filing and recording of a map is a prerequisite to the effectiveness of the ordinance under § 3, and it could be argued that the consequence of filing and recording

an inaccurate or incomplete map is that the entire ordinance is not effective until such time as an accurate and complete map is filed and recorded. We need not entertain such a drastic step in this case, and no party has asked us to do so. However, when a map fails to reflect the true and complete district as identified in the ordinance, we do not think that that inaccurate map compels us to ignore the terms of the ordinance, and certainly does not compel us to do so in a manner that would expand the district beyond the plain intent of the ordinance.[14] Rather, as part of the proceedings on remand, the parties may take up the issue whether the map itself should be corrected to reflect, in some fashion, that the specific properties owned or controlled by the association or the diocese at the time the ordinance was enacted are not part of the district or not subject to the authority of the commission.

While we conclude that the identifiable properties owned or controlled by the association or the diocese as of the date of the 1972 ordinance were lawfully excluded, we agree with the motion judge that an automatic exclusion of properties based upon their subsequent acquisition by either the association or the diocese does not comport with the Act. The Act provides that a historic district may not be reduced in size without following the steps required for the original creation of the district, i.e., an

---

[14]The dissent misconstrues the significance of the map by suggesting that, once properties are "included" on the map, the ordinance may not say anything contrary to the map. See *post* at 426, 428, 429. The dissent has it backward: a historic district is "establish[ed]" "by ordinance or by-law adopted by two-thirds vote" (G. L. c. 40C, § 3) — it is not created or established by the map. The filing and recording of a map is a prerequisite to making the "ordinance or by-law creating" a historic district "effective." *Id.* Whatever the map says, we must give "effect" to the "ordinance or by-law," and it is the terms of the "ordinance or by-law" that define and govern the historic district they have created. Errors or omissions in the map cannot operate to rewrite the ordinance or to place in the historic district properties that were not voted to be part of the historic district. Using the history of this ordinance as an example, suppose that the city council had voted in favor of the option that did not include the Quadrangle within the historic district, but that someone had then mistakenly filed and recorded the wrong map from the option that did include the Quadrangle. We would surely not conclude that the Quadrangle had thereby become part of the historic district. Unless there is the requisite two-thirds vote for an ordinance that places property in a historic district, property does not become part of a historic district merely by its inclusion on a map that is contrary to the terms of the ordinance.

investigation and report, notice, public hearing, final report, and recommendations to the city council or town meeting, and a two-thirds vote from that body. G. L. c. 40C, § 3. Property in a historic district may not be removed from the district by any means other than compliance with these statutory requirements.[15] To the extent that the exclusion allows the district to be reduced without complying with § 3, it would violate the Act.

The question whether the exclusion should be interpreted to apply to property subsequently acquired by the diocese or the association is one that has vexed the commission itself for many years. And, from the first of the commission's inquiries to the city's law department in 1991, the law department has acknowledged that that question of interpretation is a difficult one, unassisted by any record of the city council's intent at the time the ordinance was passed, and has therefore recommended a purely "literal" interpretation of the wording. According to the city's law department, that "literal" interpretation of the exclusion has the effect of extending it to after-acquired property. We reject that interpretation for several reasons.

If the city council had intended that the exclusion apply to after-acquired property, it could easily have said so. As originally worded back in 1972, the exclusion applied to property "however owned or controlled by" the association or the diocese. It did not specify whether it encompassed property "now" so owned or controlled, or whether it encompassed property "now or hereafter" so owned or controlled. Nor does the term "however" equate with "whenever" — rather, in context, "however owned or controlled" refers to control or ownership in either a direct or indirect form. It does not add a temporal component to the exclusion. Thus, the wording of the exclusion is ambiguous on this point, as its words may logically refer only to property that was in ownership or control of the association or the diocese at the time, or it may also refer to and include property that later becomes subject to such ownership or control. Accordingly, we must resolve that ambiguity.

Just as we interpret statutes in a manner that avoids rendering

---

[15]Nor, for that matter, may property that is not in a historic district be added to the district without following these steps, as the requirements of § 3 also pertain to any enlargement of a historic district.

them unconstitutional, see *School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 79 (1982); *Staman* v. *Assessors of Chatham*, 351 Mass. 479, 487 (1966), we should interpret an ambiguous ordinance in a manner that avoids violating its enabling statute. Here, applying the exclusion to after-acquired property would be a clear violation of the Act, and we should not resolve the ambiguity in the ordinance in a fashion that would create such a violation.

Similarly, where a literal reading of the terms of a statute or municipal bylaw would lead to an absurd or unreasonable result, we reject that literal interpretation in favor of one that comports with the purpose of those terms. See *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996), quoting *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982); *Green* v. *Board of Appeal of Norwood*, 358 Mass. 253, 258 (1970); *Lehan* v. *North Main St. Garage*, 212 Mass. 547, 550 (1942). Cf. *Greater Boston Real Estate Bd.* v. *Boston*, 428 Mass. 797, 802, 804 (1999) (court will not rewrite offending provision where invalid ordinance provisions too embedded to allow severance from valid provisions; redrafting ordinance is task for municipality). Here, as the commission observed long ago, applying the exclusion based on the transfers of property subsequent to the adoption of the ordinance makes the exercise of its authority a game of "musical chairs," and could lead to the elimination of its authority anywhere in the district, effectively abolishing the district in its entirety. This is indeed an absurd and unreasonable result, and the commission long ago proffered the more logical interpretation that would avoid such a result, i.e., interpreting the exemption to apply only to property owned or controlled by the association or the diocese at the time the ordinance was adopted.

We resolve the ambiguity in the exclusion in a manner that avoids violating the Act and avoids absurd and unreasonable consequences, and thus conclude that it applies only to properties owned or controlled by the association or the diocese at the time the ordinance was adopted, unaffected by any later transfers of ownership or control to or from the association or the diocese.[16] As such, the Donoghue property was not covered by the exemp-

---

[16]The dissent, while acknowledging that the ordinance is ambiguous,

tion, and it was at all times within the district and subject to the authority of the commission.

d. *Trust's cross appeal.* The trust claims that the motion judge erred in denying its request for further hearings on the issue of remedies, arguing that in addition to seeking a preliminary injunction to prevent the demolition of the house and a declaration that the ordinance was invalid, its complaint also requested "such other and further relief as this Court deems just and proper." A fair reading of the transcript of the hearing before the judge who issued the interim order narrowing the legal issues to be considered shows that the trust did not waive its rights to request further remedies. While it acknowledged that the only remaining legal issue was its claim that the exemption was invalid, it did not thereby state or intimate that it would only seek a declaration to that effect. To the contrary, counsel for the trust noted the concern that the association still owned the Donoghue property, that the property was not exempt, and that an injunction with respect to future construction on that property might be appropriate. The judge stated that he would "issue an interim order that acknowledges some of the things that have been said here and the manner in which the *issues* have been limited" (emphasis added), and thereafter issued the interim order reflecting the trust's agreement that its only "claim" was "the alleged illegality" of the exclusion.

Subsequently, in its motion for partial summary judgment,

criticizes our resolution of that ambiguity by claiming that we are "implicitly" adding "missing qualifiers" to the exemption and "rewriting" the ordinance. *Post* at 429. Whenever this court resolves an ambiguity in a statute, regulation, ordinance, or bylaw, we inherently provide some specificity or clarification that goes beyond what can be gleaned from the ambiguous wording alone. Here, the dissent's proposed interpretation does the same thing — it adds "missing qualifiers" to the exemption (e.g., property "now or hereafter" owned or controlled by the diocese or the association, or property "at any time" owned or controlled by the diocese or the association). The resolution of an ambiguous provision, by resort to standard principles of statutory construction, is not an impermissible "rewriting" of the provision. Here, we apply two such standard principles — avoidance of a violation of the governing statute and avoidance of an absurd or unreasonable result — and interpret the ambiguous exemption as covering only those properties owned or controlled by the diocese or the association at the time the ordinance was adopted. The dissent does not identify what canons of construction were used in reaching a contrary resolution of this ambiguity.

the trust expressly reserved the right to seek possible remedies in the event that it prevailed on that "claim." Specifically, the trust's memorandum in support of its motion for partial summary judgment referenced the Act's broad grant of equitable powers to the Superior Court to fashion appropriate relief (G. L. c. 40C, §§ 12A and 13), observed that those powers would allow the motion judge to award damages or fines, and stated that the fashioning of appropriate remedies would "require a factual record and further proceedings." At no time did the trust waive its right to seek appropriate remedies in the event it prevailed on its claim that the exemption was invalid.

At this juncture, the trust has prevailed in part on that claim, in that the exemption may only be applied to property owned or controlled by the association or the diocese at the time of the 1972 adoption of the ordinance, and not to after-acquired property like the Donoghue property. The Act makes clear that the fashioning of any remedies for violations of the Act, or for erroneous rulings by the commission, is a matter of equity, G. L. c. 40C, §§ 12A and 13, and is thus subject to the full panoply of equitable considerations and equitable defenses. We express no opinion as to what remedies (if any) would be equitable and appropriate at this juncture, or what equitable considerations or defenses might justify the denial of any further relief or remedy. We agree, however, that the trust has not waived its right to pursue remedies, and that the motion judge erred in cutting off the trust's right to be heard on its request for remedies beyond the declaration itself. And, now that we have interpreted the ordinance in a manner different from the motion judge, and have ruled that the exclusion so interpreted is valid, all parties should be given the opportunity to address the issue of what remedial steps (if any) should equitably be ordered to implement that interpretation and enforce the ordinance as so interpreted.

4. *Conclusion.* For the reasons set forth above, we conclude that the second sentence of § 2.46.030(A) of the Revised Ordinances of the city of Springfield applies only to property however owned or controlled by the Springfield Library and Museums Association, Inc., or the bishop of the Roman Catholic diocese of Springfield at the time the ordinance was adopted;

that, so interpreted, it is valid under the Historic Districts Act; and that Springfield Preservation Trust, Inc., is entitled to be heard on the issue of remedies under the Act. We vacate the final judgment and remand the case for further proceedings consistent with this opinion.

*So ordered.*

IRELAND, J. (concurring in part and dissenting in part, with whom Spina and Cowin, JJ., join). I concur in the court's conclusion that Springfield Preservation Trust, Inc., is entitled to a hearing on further remedies. I write separately because I disagree with the court's conclusion that the exemption contained in § 2.46.030(A) of the Revised Ordinances of the city of Springfield (ordinance) is valid for property owned by the Springfield Library and Museums Association, Inc. (association), and the bishop of the Roman Catholic diocese of Springfield (diocese) at the time the Quadrangle-Mattoon Street Historic District (district) was created in 1972. Rather, I believe that the court should have affirmed the motion judge's decision to strike the entire exemption as contained in the second sentence of the ordinance.

A historic district must be determined by the legislative branch of a municipality through the creation of a map depicting the boundaries of the district. G. L. c. 40C, § 3. Contrary to the court's holding today, there is nothing in the statute that states that a municipality can include properties within a map of a historic district yet exempt them through the language of an ordinance, as was done here. I believe that the city exceeded its authority under the Historic District Act, G. L. c. 40C (Act), when it created the exemption without excluding those properties from the requisite map. See *Beard* v. *Salisbury*, 378 Mass. 435, 439-440 (1979). See also *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870, 877 (1986) (municipality may have powers not expressly granted in enabling statute, if they are "essential and not merely convenient to the implementation of express powers conferred by statute").

The ordinance itself cites § 8 (*b*) of the Act as authority to enact the exemption. I agree with the motion judge that § 8 (*b*)

"does not authorize a commission, or municipality, to exempt buildings from commission review and does not authorize the exemption of categories based on ownership and control."

The association argues that § 10 (*i*) of the Act offers the actual authorization for the exemption. I disagree. As the court notes, *ante* at 418-419, § 10 (*i*) grants a municipality the authority to increase the power or duties of a historic district commission beyond those set forth in the statute. However, because the exemption here excludes property within the district from the power of the Springfield Historical Commission (commission) to review, it is a reduction of the power and duties of the commission, not an increase.

The association and the diocese correctly point out that the Act gives municipalities the discretion whether to establish a historic district and to determine its composition. However, there is no basis to their arguments that the statute grants municipalities broad discretion to create the exemption based on ownership or control. Their argument is based on the selective focus on individual words of the statute, particularly in §§ 3 and 8, which are taken out of context.[1] As the motion judge pointed out: "The room for discretion [under the statute] is narrow, the list of exemptions [is] finite." The judge correctly stated:

> "[The Act] grants the [c]ity the power to create historic districts, as well as the power to exempt from the requirements of those districts one or more of a finite set of categories. The power to exempt categories based on ownership or control is not explicitly granted, nor is it necessary to carry out the express powers conferred by the . . . Act. The [c]ity can create, reduce, expand, and otherwise maintain its historic districts without the power to exempt based on ownership or control. . . . [Thus,] the

[1] I likewise reject, as without merit, the association's argument that the "unfettered ability of the [association] to administer its properties correlates with" the statute's purpose. The association would have us selectively focus on the words in the first part of G. L. c. 40C, § 2, which states that the statute's purpose is to "promote the educational, cultural, economic and general welfare of the public," and ignore the clarifying clause that follows directly thereafter, "through the preservation and protection of the distinctive characteristics of buildings and places."

> failure to infer this particular power from the ones
> expressly granted would not impair the [c]ity in its exercise
> of authority, nor would it decrease the effectiveness or
> longevity of the [c]ity's preservation efforts."

See *Greater Boston Real Estate Bd.* v. *Boston, supra* at 878 (invaliding ordinance essentially precluding condominium conversion as not essential to carrying out rent control enabling statute). Cf. *Flynn* v. *Cambridge*, 383 Mass. 152, 158-159 (1981) (city had implied power to regulate removal of rental units from housing market pursuant to statute allowing rent control).

What is critical here is that property owned by the association and the diocese are included within the map delineating the boundaries of the historic district, as was the property that was demolished. Once a historic district is created, all property within the district is subject to the procedures for alteration contained in the Act, e.g., report, study, notice, and public hearing. G. L. c. 40C, § 3. As the motion judge stated, these procedures show that the Legislature recognized "that any departure from the [Act's] guiding purpose of 'preservation and protection' must be undertaken with care and deliberation. The exemptions [here] . . . permit the [d]istrict to be whittled away with almost no deliberation whatsoever (simply by receiving a certificate of non-applicability from the [c]ommission), and with no investigation, report, or public hearing. . . . Permitting the reduction of the [d]istrict by such casual, near-ministerial means violates both the letter of § 3 and the purpose of the [Act]."[2] It constitutes an impermissible delegation of legislative authority to private interests.

The association and the diocese argue that case law, particularly *Opinion of the Justices*, 333 Mass. 783 (1955), and *Opinion of the Justices*, 333 Mass. 773 (1955), supports their position that the statute allows exemptions to be based on ownership or control. These advisory opinions are not apt. They were decided before G. L. c. 40C was enacted, and in each

---

[2]The motion judge also noted that the certificate of nonapplicability was issued "despite the fact that only two of the [c]ommission's seven members voted to issue the certificate." General Laws c. 40C, § 11, requires a vote of a majority of commission members to issue a certificate.

instance, the court was asked by the Senate to decide whether the establishment of historic districts on Nantucket and Beacon Hill were a constitutional exercise of State legislative power. Although *Opinion of the Justices*, 333 Mass. 783 (1955), involved a proposed act that exempted from the Historic Beacon Hill District land owned by the Commonwealth, it does not provide authority in support of the association and the diocese's argument that this is analogous to the exemption for their property. The Legislature may choose to exempt land owned by the Commonwealth from a historic district the Legislature chooses to create, but that is hardly the same as a city or town, sua sponte, assuming it can exempt property owners located in a historic district from the procedures and requirements of an enabling statute, where there is no explicit statutory authority to do so and such power is not essential to effectuate the statute's purpose. *Greater Boston Real Estate Bd.* v. *Boston, supra* at 877. See *Conservation Law Found. of New England, Inc.* v. *Director of the Div. of Water Pollution Control in the Dep't of Envtl. Quality Eng'g*, 22 Mass. App. Ct. 544, 556 (1986) (Appendix) (listing examples where Legislature "considered [historic] protection mandatory [and] enacted site-specific legislation").

However, even assuming that the statute does not prohibit municipalities from including properties on an official historic district map and then excluding those same properties through the language of an ordinance, I still conclude that this particular exemption should be struck. Validating the exemption requires the court implicitly to add (or substitute) missing qualifiers to the phrase "however owned or controlled" to the exemption, to reach the conclusion that the city wanted the exemption to the apply to the property the association and diocese owned in 1972. As the court concedes, however, there is no record of what the city council intended by the language of the exemption as written in 1972, and the words "however owned or controlled" are ambiguous. *Ante* at 422. If the city had wanted the ordinance to apply to those properties owned by the association and diocese in 1972, it easily could have provided language (such as the word "presently") indicating that intent.

We have declined to do such rewriting of ordinances in the

past. *Greater Boston Real Estate Bd.* v. *Boston*, 428 Mass. 797, 802, 804 (1999) (court will not rewrite offending provision where invalid ordinance provisions too embedded to allow severance from valid provisions). Further, the cases the diocese cites do not show an instance where this court has added qualifiers to an invalid ordinance or exemption. *Id.* at 804 (redrafting ordinance is task for municipality).

Given the statutory scheme as I read it, the lack of any indication of the city's intent concerning the exemption, the ambiguity in the language of the exemption itself, and our past case law, I cannot indorse the court's interpretation of the exemption. Therefore, I respectfully dissent from that part of the court's opinion.